666 A.2d 642

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Donetta HILL, Appellant.**

Supreme Court of Pennsylvania.

Argued April 25, 1995.

Decided Sept. 29, 1995.

294

Lynne Bennett–Hamlin, Philadelphia, for Donetta Hill.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, Norman Gross, Philadelphia, for Commonwealth.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

On April 6, 1992, Appellant, Donetta Hill, was convicted by a jury of two counts of murder of the first degree,[1] robbery,[2]

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701.

and two counts of possession of an instrument of crime.[3] At the conclusion of the penalty phase of Hill's trial, the jury returned a sentence of death for each of the two first degree murder convictions. Based upon the imposition of a sentence of death, we have jurisdiction to review this direct appeal of Hill's conviction and sentence pursuant to 42 Pa.C.S. § 9711(h)(1).[4]

In all death penalty cases, we begin by performing our self-imposed obligation to independently review the evidence underlying each first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard upon which we review the sufficiency of the evidence is whether the evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of guilt beyond a reasonable doubt. *Commonwealth v. Rhodes*, 510 Pa. 537, 539–40, 510 A.2d 1217, 1218 (1986).

On June 28, 1990, seventy-two-year-old Nghia Quy Lu propositioned Donetta Hill to have sex with him for money. The two went to the basement of Mr. Lu's home at 1931 South 8th Street in Philadelphia and had sex. Lu was five feet, six inches tall, and weighed one hundred twenty-six pounds. Hill stood five feet, five inches, and weighed one hundred sixty pounds. After engaging in sex, Hill grabbed a hammer and struck Lu in the back of the head several times. Lu collapsed and died from his injuries. Hill then ransacked the house and took several items, including a Longines watch, two gold rings with Chinese inscriptions, and a pair of gold-rimmed eye glasses.

Later that day, Lu's son and daughter-in-law returned home and found Lu's body lying in a pool of blood on the basement

3. 18 Pa.C.S. § 907.

4. 42 Pa.C.S. § 9711(h)(1) provides that "[a] sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules."

floor with his pants pulled down to his knees. There was a large burn wound on Lu's chest, and a blood stained hammer was found lying near the body.

Hill brought the items stolen from Lu to the home of her friend Melinda Williford. She asked Williford to sell the watch and gold rings at a neighborhood jewelry store. Williford sold one of the gold rings to the jeweler for twenty-five dollars and split the proceeds with Hill.[5]

Approximately nine months later, twenty-one-year-old Nairobi Dupont offered money to Hill to have sex with him in his father's house. Dupont, who was "mentally slow," stood four feet, eleven inches tall and weighed eighty-five pounds. The Dupont home was located at 504 Emily Street in Philadelphia, less than four blocks from the site of the Lu murder. Hill entered the home and had sex with Nairobi Dupont. Afterwards, she grabbed a hammer and struck Dupont repeatedly in the back of the head. As Dupont lay dead or dying on the floor, Hill ransacked the house and took several items, including two video cassette recorders, a number of video cassettes, and a television remote control. She then fled the scene.

On March 9, 1991, Nairobi Dupont's father returned from a two week vacation and found his house in a state of disarray. He eventually discovered the body of his son on the kitchen floor. The police arrived shortly thereafter and recovered a blood-stained hammer near the victim's body. They also recovered from the crime scene a red pocketbook which contained an identification card belonging to Donetta Hill.

Hill took the two videocassette recorders stolen from the Dupont residence to the home of an acquaintance, Dwayne Culler. Culler gave her twenty dollars and four vials of crack cocaine in exchange for the equipment. Hill returned to Culler's home sometime thereafter with a bag of video cassettes stolen from the Dupont home for which she received two additional vials of crack cocaine.

5. Williford testified that she discarded the other ring because it had no value and sold the watch at a later time to an individual named "Buster." (N.T. 3/25/92, 49).

After Hill learned that police wanted to question her, she went to the office of her probation officer. Accompanied by her probation officer and another member of his office, Hill went to the homicide division of the Philadelphia police department. Once there, Hill was taken to an interview room and fully advised of her *Miranda* rights. She ultimately confessed to the murder of Nairobi Dupont and signed a written statement to that effect. Shortly thereafter, Hill was again advised of her *Miranda* rights and questioned about the murder of Nghia Quy Lu. Hill told the detectives questioning her that she was present when Lu was murdered, but that her friend, Bruce Baldwin, had committed the killing.

At the conclusion of the interview, the detectives faxed Hill's statement to the district attorney's office where the decision was made to hold Hill and charge her with the murder of Nairobi Dupont. Four days later, while in custody, Hill returned to the homicide division to speak with detectives regarding the Lu murder. After once again being informed of her *Miranda* rights, Hill admitted that she had killed Lu and later signed a written statement attesting to that fact.

Based upon the foregoing facts, it is evident that sufficient evidence was presented to support the first degree murder convictions. We therefore proceed to address Hill's allegations of error relating to her trial and defense counsel's ineffectiveness.

Hill first claims that the prosecutor committed misconduct which prejudiced her and thereby deprived her of a fair trial. In support of this contention, Hill cites six separate instances where the prosecutor cross-examined her and presented rebuttal evidence concerning: the fact that she was on welfare; her cocaine use during pregnancy; her prior sentences of imprisonment; her probation violation; the fact that "wanted cards" had been issued for her; and her use of profanity during questioning by police. Our review of these allegations is guided by the fact that a defendant is not entitled to relief for a claim of prosecutorial misconduct unless the "unavoidable effect" of the prosecutor's comments or

actions "is to 'prejudice' the jury so that a true verdict cannot be rendered because the existence of bias and hostility makes it impossible to weigh the evidence in a neutral manner." *Commonwealth v. Baker*, 531 Pa. 541, 558, 614 A.2d 663, 671 (1992) (quoting *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986)).

First, the revelation that Hill was on welfare was made by Hill herself. On direct examination by her attorney, Hill indicated that the only form of photographic identification that she possessed was a card issued by the Department of Public Assistance. (N.T. 3/31/92, 66–67). This information was elicited by defense counsel in order to provide an explanation as to why a purse containing that particular identification card was found at the scene of Nairobi Dupont's murder. Hill testified that she had given the card to her sister so that she could pick up Hill's welfare check. (N.T. 3/31/92, 66–67). This testimony was offered to explain why the identification card was no longer in Hill's possession and consequently could not have been left by her at the murder scene. Clearly then, it was permissible for the prosecutor to inquire further into the subject matter raised on direct examination, and Hill's claim that this information was elicited for purposes of inflaming the jury's passion is totally unfounded. *See e.g. Commonwealth v. Schmidt*, 437 Pa. 563, 263 A.2d 382 (1970) (the scope and limits of cross-examination are largely within the discretion of the trial court and its decisions pertaining thereto will not be reversed in the absence of a clear abuse of discretion or error of law).

Hill next argues that the prosecutor improperly exploited her admission that she used illegal drugs. The subject of Hill's cocaine use was raised by the defense during the cross-examination of Melinda Williford and by both the prosecution and defense during the direct and cross-examination of Donetta Hill. Again, this subject was first raised by defense counsel, and thus, the prosecutor was entitled to further explore it during cross-examination. *See id.*

■ Hill also takes exception to the prosecutor's questions concerning her use of cocaine while she was pregnant. She claims that this information had no probative value and was elicited solely to assail her character in front of the jury. We disagree and find that such information was relevant in light of her claim that she was coerced by police to confess. Hill contended at trial that she signed a written confession admitting to the two murders because police threatened to take her children away if she refused. It was therefore entirely proper for the prosecutor to call into question Hill's concern for the welfare of her children given her assertion that she falsely confessed to murder out of fear that her children would be taken away.

■ In a related claim, Hill asserts that the prosecutor lacked a good faith basis in pursuing the following line of questioning:

Q [by the prosecutor]: You'll do anything [for your kids]?

A [by Donetta Hill]: Anything for my kids. If you was a woman like I am, I suggest you would do the same.

Q: And these are children that you love and care about very much; is that right?

A: Yes.

Q: You would do anything for them; is that right?

A: Yes.

Q: Is that why in February of 1991 you left them alone with your mother and ran off onto the streets?

A: No, I didn't.

Q: So, if your mother called your probation officer and told him that she had not seen you in February or March or April of 1991 and they had no idea where you were and who was going to take care of the kids, that would be a lie?

A: That's a lie.

(N.T. 3/31/92, 123–24). Hill maintains that her probation officer did not corroborate this allegation when questioned by the prosecutor, and further, that the prosecutor failed to present any rebuttal witnesses to support her contention.

However, the record is devoid of any objection raised by Hill on this point, and Hill never requested that the prosecutor state her basis for pursuing this line of questioning. Thus, she can not now be heard to complain that the prosecutor never offered a good faith basis for this inquiry. *See e.g. Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974) (issue was waived because the trial judge was not given an opportunity to rectify the errors at the time that they occurred). Although this Court does not rigidly adhere to the rules of waiver in death penalty cases,[6] we nevertheless conclude that Hill is not entitled to relief. Assuming *arguendo* that the prosecutor did not have a good faith basis to question Hill concerning the abandonment of her children, the overwhelming evidence of guilt presented at trial renders harmless any negative inference that may have resulted from the prosecutor's brief questioning on this point.

Hill next contends that the prosecutor committed misconduct by cross-examining her concerning prison sentences that she received for two robbery convictions. The Commonwealth responds that Hill opened the door to this subject on direct examination when she indicated that she was on "ISP" or intensive supervision probation house arrest. It is the Commonwealth's position that Hill's testimony misled the jury by suggesting that she was sentenced to probation because her convictions were only for minor infractions.

The record reveals that defense counsel made a timely objection when the prosecutor asked Hill about the sentences she received for her robbery convictions. (N.T. 4/1/92, 9). A sidebar discussion followed whereby defense counsel and the prosecutor argued in support of their respective positions concerning the admissibility of this information. The trial judge indicated that he did not recall whether Hill had volunteered that she was on probation or whether it was given as a response to a question. (N.T. 4/1/92, 15). He then concluded

6. *See Commonwealth v. Billa,* 521 Pa. 168, 181, 555 A.2d 835, 842 (1989); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 50 n. 19, 454 A.2d 937, 955 n. 19 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

that if Hill had responded that she was put on probation, the prosecutor had a right to inquire about it. (N.T. 4/1/92, 15). Consequently, the prosecutor briefly pursued the matter and it was revealed that Hill had been sentenced to eight to twenty-three months in prison followed by two years probation for one second degree robbery conviction and five to twelve months followed by two years probation for a third degree robbery conviction.

The fact that Hill was on probation was first brought to the jury's attention when Hill stated that she stopped to see her probation officer prior to going to the homicide division of the Philadelphia Police Department. (N.T. 3/31/92, 47). Then, in a series of leading questions, defense counsel elicited from Hill that she was on probation, specifically ISP house arrest, as a result of guilty pleas that she had entered concerning two charges of robbery. "[T]he admissibility of evidence is a matter addressed to the sound discretion of the trial court and an appellate court may only reverse rulings on admissibility upon a showing that the lower court abused its discretion." *Commonwealth v. Billa*, 521 Pa. 168, 177, 555 A.2d 835, 840 (1989). Although we do not find persuasive the Commonwealth's argument that Hill intended to deceive the jury as to the severity of her robbery convictions, we nevertheless are unable to conclude that the trial judge abused his discretion in allowing the prosecutor to question Hill concerning a subject that she first raised on direct examination.

Additionally, on both occasions when the subject of these robbery convictions arose, the trial judge promptly cautioned the jury that such evidence could not be accepted as evidence of the defendant's bad character but only to assess the credibility of her testimony. (N.T. 3/31/92, 47–48; 4/1/92, 16–17). Finally, given the overwhelming evidence of guilt in this case, we find that the brief reference to the prison sentences that Hill received for her guilty pleas was harmless.

The next alleged instance of prosecutorial misconduct took place on rebuttal when the prosecutor questioned Hill's probation officer about a probation violation that occurred

prior to the murders. Specifically, it was elicited that Hill had twice not reported to her probation officer in January 1991, and further, that she tested positive for drugs in one of the urine samples that she was required to give as a condition of her probation. (4/1/92, 63–64). Our review of the record fails to support Hill's claim that this testimony was irrelevant and prejudicial.

It is clear that the prosecutor elicited this testimony to rebut specific assertions made by Hill on redirect examination that she reported to her probation officer regularly in January 1991, and that she never tested positive for drugs. (N.T. 4/1/92, 26–27). Although not directly relevant to the question of Hill's guilt or innocence, this rebuttal evidence was admissible in order to challenge Hill's credibility before the jury. See Commonwealth v. Smith, 490 Pa. 380, 416 A.2d 986 (1980) (the admission or rejection of rebuttal evidence is within the sound discretion of the trial court); Kaplan v. Loev, 327 Pa. 465, 467, 194 A. 653, 654, cert. denied, 302 U.S. 766, 58 S.Ct. 477, 82 L.Ed. 595 (1938) ("As bearing on his credibility, a witness may be cross-examined as to inconsistent acts or conduct generally, acts or conduct inconsistent with his testimony, or omissions on his part which tend to discredit him."). Thus, Hill is not entitled to relief on this claim.[7]

Hill's final allegation of prosecutorial misconduct requires little discussion. Hill asserts the prosecutor improperly attempted to blacken her character by questioning whether she used profanity while being interrogated by homicide detectives. Our review of the record discloses a number of occasions on direct examination where Hill used expletives in attempting to describe the alleged profanity that detectives

7. Hill also claims that, in response to the prosecutor's inquiry concerning her failure to report for probation, her probation officer indicated that a wanted card was issued for her. Notwithstanding Hill's failure to state with specificity how this fact prejudiced her, we find that Hill's probation officer offered this information while answering a question concerning Hill's failure to report to him. For the reasons set forth above, this information was properly elicited to rebut Hill's claims that she reported to her probation officer regularly and never failed a drug test.

directed toward her. (N.T. 3/31/92, 51, 55–56, 61). In one instance, Hill explained to the jury that an antagonistic verbal exchange between the police and her ended when she told one of the detectives to "f___ his mother in the mouth." (N.T. 3/31/92, 62). Based upon her unrestrained use of foul language during direct and cross examination, Hill's suggestion that she was prejudiced by the prosecutor's questioning on this subject is completely baseless.

Accordingly, we conclude that none of the allegations of prosecutorial misconduct, either individually or cumulatively, warrants relief in this case. The overwhelming evidence of Hill's guilt casts little doubt that the challenged conduct in this case was harmless. Furthermore, we decline to characterize any of the Hill's complaints about the prosecutor's actions in this case as misconduct.

Hill next relies upon several of the instances set forth above as grounds for relief based on claims of ineffective assistance of counsel. In order to prevail on such a claim, it must be shown that the claim has arguable merit, that there was no reasonable basis for counsel's action or inaction, and that the defendant was prejudiced in such a way that the outcome of the trial could reasonably have been different. *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987). Because her defense strategy was based on denying participation in the crime, Hill's ineffectiveness claims are premised on trial counsel's elicitation of evidence concerning her lifestyle and prior bad conduct, as well as his failure to have excluded other such evidence. She contends that such evidence undermined her credibility before the jury, and therefore, was at odds with the defense strategy.

Although Hill cites specific portions of the record[8] to bolster her allegations of ineffectiveness, her arguments take the

---

8. We hasten to express our disapproval over a blatant misrepresentation of the record in this case. In attempting to cite specific instances where trial counsel elicited allegedly prejudicial testimony concerning her lifestyle, Hill's brief to this Court offers the following: "At still another point in the trial, trial counsel elicited yet again the fact that defendant does drugs. In response to a defense question, Common-

form of generalized complaints directed at the questions asked by trial counsel concerning her lifestyle on welfare, her drug use, her probation violations, and her fencing of stolen property. To the extent that specific requests for relief can be discerned, we will address them individually.

At trial, Melinda Williford, a long-time friend of Hill's, testified that Hill had given her a pair of gold-framed glasses, a watch, and two gold rings to sell to a local jeweler. (N.T. 3/25/92, 45–46). Williford sóld one of the rings to the jeweler for twenty-five dollars and gave Hill ten dollars from the proceeds of the sale. (N.T. 3/25/92, 46–48). She testified that she threw the second ring away because it was worthless and sold the watch for fifteen dollars to someone else. (N.T. 3/25/92, 49). This testimony was particularly damaging because Han Lu, the son of murder victim Nghia Quy Lu, had previously testified that items of the same description belonging to his father were missing when he discovered his father's body. (N.T. 3/24/92, 92, 97).

In order to discredit Williford and her version of the jewelry transaction, trial counsel elicited testimony that she and Hill smoked crack together. During his closing argument, trial counsel argued that Hill, who was addicted to crack and on welfare, would not have murdered someone in order to steal their valuables and then give the stolen goods to someone else. (N.T. 4/2/92, 9–12). Given the nature of Williford's testimony, we cannot conclude that trial counsel acted unreasonably in light of the limited options available to impeach the credibility of this witness and offer an alternative explanation of the events that took place. *Cf. Commonwealth v. Birdsong*, 538

wealth witness Oliver Mosley says, '*I know the defendant does drugs....*' (N.T. 3/26/92, p. 53)." Brief for Appellant at 33 (emphasis added). However, our review of the transcript reveals that Oliver Mosley never made such a statement either directly or impliedly:

Q [by defense counsel]: Were you ever involved in doing drugs with Donetta Hill?
A [by Oliver Mosley]: No.
Q: Did Donetta Hill do any drugs, to your knowledge?
A: I know she drinked or something like that there, but she ain't do none in my house.
(N.T. 3/26/92, 53).

Pa. 587, 650 A.2d 26 (1994) (trial counsel's disclosure of defendant's prior bad acts was a reasonable trial strategy designed to show why Commonwealth witnesses would lie).

Hill also contends that trial counsel was ineffective for not attempting to have her prior robbery convictions excluded from the jury during the guilt phase of her trial under *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973). This argument is wholly without merit as this Court has held subsequent to *Bighum* that "evidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement, and the date of the conviction or the last day of confinement is within ten years of the trial date." *Commonwealth v. Randall,* 515 Pa. 410, 415, 528 A.2d 1326, 1329 (1987). Hill's prior convictions for robbery, which occurred less than ten years prior to her trial, were therefore admissible as a means of impeaching her credibility. *See Commonwealth v. Yarris,* 519 Pa. 571, 588 n. 1, 549 A.2d 513, 522 n. 1 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 708 (1989). Thus, no relief is due because counsel can never be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981).[9]

We also find meritless Hill's complaint concerning testimony elicited by trial counsel that she traded stolen property for money and drugs. The record indicates that this subject was first raised by the Commonwealth during its case-in-chief several days prior to the time when Hill alleges trial counsel wrongly inquired about it. (N.T. 3/26/92, 58–62; 3/31/92, 104). This evidence was clearly admissible because Hill was charged with, and convicted of, robbery for the items stolen from the Dupont home. Alternatively, this evidence would also be admissible to establish Hill as the murderer

9. Hill also complains that she was prejudiced by trial counsel's disclosure of the fact that she was on probation as a result of these robbery convictions. Due to the fact that Hill's *crimen falsi* convictions were admissible, it is obvious that no prejudice resulted from trial counsel's actions.

based on the connection between the murders and the specific articles of personal property that were stolen from each murder scene. As we stated in *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715 (1981),

> [t]he general rule ... allows evidence of other crimes to be introduced to ... establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Id.* at 175, 425 A.2d at 720. Accordingly, we conclude that the admission of this evidence was proper, and Hill's claim of ineffectiveness is without foundation.

Hill additionally makes the blanket assertion that there was no reasonable basis for trial counsel's failure to object to the admission of the evidence set forth in her claims alleging prosecutorial misconduct. Like her previous argument, Hill claims only that this evidence was inherently prejudicial and that she was entitled to have her credibility judged free of this damaging evidence. In light of the fact that we have previously concluded that Hill was not prejudiced by the admission of this evidence, we need not revisit these issues in the context of a claim of ineffective assistance of counsel. Hill has not met her burden of proving prejudice, and thus, has failed to overcome the presumption of trial counsel's effectiveness. *See Commonwealth v. Miller,* 494 Pa. 229, 431 A.2d 233 (1981).

Hill's next assignment of error is directed at the instructions given by the trial court to the jury during the penalty phase of her trial. She maintains that the jury received very little guidance as to the nature and method of weighing mitigating circumstances. Hill additionally contends that the jury was never told that if it found mitigating circumstances that it could dispense mercy and impose a life sentence. Our review of the record fails to support Hill's argument concerning the trial court's instructions, and further, we disagree with her argument that the jury should have been advised that it could have sentenced her to life based on sympathy.

█ The trial court instructed the jury on the essential points necessary for it to make an informed decision pursuant to the guidelines set forth in the Sentencing Code for death penalty cases, 42 Pa.C.S. § 9711. The court instructed that the defendant had to prove any mitigating circumstance by a preponderance of the evidence; that the mitigating circumstance in this case was evidence concerning the character and record of the defendant and the circumstances of her offense; that any individual juror could find present the mitigating circumstance presented by the defendant; and that the aggravating circumstances should be weighed qualitatively, not quantitatively, against the mitigating circumstances during jury deliberations. (N.T. 4/7/92, 37–41). In addition, the court read the entire verdict slip to the jury prior to sending it to deliberate Hill's sentence and twice admonished the jury to read it again before deliberating. (N.T. 4/7/92, 41–44, 60). Having reviewed the court's instructions as a whole, we conclude that the jury was adequately instructed as to the mitigating circumstance presented by Hill as well as the proper method of weighing that circumstance in its deliberations.

█ We must also reject Hill's claim that the court should have instructed the jury that it could have dispensed mercy if it so chose. In *Commonwealth v. Young,* 536 Pa. 57, 637 A.2d 1313 (1993), the appellant presented essentially the same argument claiming that the trial court had erred in refusing his request to instruct the jury that it was free to impose a life sentence for any reason whatsoever. We held that the trial court did not err in refusing the request because

such an instruction would inject arbitrariness and capriciousness into the capital sentencing process. In the absence of a standard to guide the jury's expression of mercy and leniency, there would be no guarantee of consistency in sentencing across cases. [The a]ppellant was allowed to present and argue any evidence which was relevant and admissible in an attempt to convince the jury that the death sentence should not be imposed in his case. That is all that is constitutionally required.

*Id.* at 76, 637 A.2d at 1322 (citations omitted). We find this reasoning applicable to Hill's instant claim for relief, and therefore, conclude that the trial court did not err in failing to advise the jury that sympathy could be considered in its deliberations over the appropriate sentence.[10, 11]

10. Hill also contends that trial counsel was ineffective for failing to request that the trial court instruct the jury that it could utilize its mercy dispensing power by imposing a life sentence. Hill cites *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992), *cert. denied*, 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993), for the proposition that this Court approved of an instruction in which the judge allegedly advised the jury that it could consider mercy and sympathy as a reason for imposing a life sentence. However, a proper reading of Zook clearly belies Hill's interpretation. The court's instruction in that case stated that any sympathy or mercy that the jury wished to bestow had to be based on the mitigating circumstances presented by the defendant. In approving that instruction, we emphasized that "[t]he Pennsylvania death penalty statute does not permit a jury to avoid imposition of a death sentence through the exercise of an unbridled discretion to grant mercy or leniency." 532 Pa. at 104, 615 A.2d at 13.

Because we have already concluded that the underlying claim is without merit, Hill's charge of ineffectiveness must be summarily rejected. *See e.g. Commonwealth v. Parker*, 503 Pa. 336, 469 A.2d 582 (1983) (counsel cannot be deemed ineffective for failing to pursue a meritless claim).

11. In connection with her complaint that the trial court's penalty phase jury instructions were deficient, Hill makes several other claims which require little discussion. Hill cites the following excerpt from the prosecutor's opening comments during the penalty phase as grounds for a new sentencing hearing: *"As the Judge has just stated,* the aggravating circumstances which *we* are proceeding [sic] are...." (N.T. 4/7/92, 107) (emphasis added). She argues that this statement implied to the jury that the judge was in agreement with the Commonwealth that the aggravating circumstances enumerated by the prosecutor had been established.

Hill cites another example of alleged prejudice during the penalty phase where the jury requested further guidance from the trial court when it had reached an impasse in its deliberations. The court responded, "I'm not trying to pressure you, believe me. This is a dreadfully important and serious decision that you have to make." (N.T. 4/7/92, 62). Hill claims that this response in conjunction with the court's earlier statement, "I want to advise you [the jury] that the Commonwealth is, indeed, seeking the death penalty in this case...." could have been viewed by the jury as the court's endorsement of the death penalty in this case. (N.T. 3/24/92, 9).

We fail to see how any reasonable person could construe these comments to suggest that "the prosecutor's theory of the case was ... approved by the court." Brief for Appellant at 36–37. Moreover, the court clearly indicated that it was solely the decision of the jury to

 Hill next alleges that the prosecutor's summation to the jury at the penalty phase was inflammatory and prejudicial. Hill claims that the prosecutor improperly stated that the victims' families, not the defendant, deserved the sympathy in this case; that the jury could consider the fact that one of the victims did not understand the English language; and that the jury should not be swayed by sympathy due to Hill's age, sex, or the fact that she cried during the sentencing proceeding.

> The primary guideline in assessing a claim of error of this nature is to determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury. Nevertheless, we do require that the contentions advanced must be confined to the evidence and the legitimate inferences to be drawn therefrom. Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated. The verdict must flow from the respective strengths and weaknesses of the evidence presented and not represent a response to inflammatory pleas for either leniency or vengeance.

*Commonwealth v. Brown,* 489 Pa. 285, 297–98, 414 A.2d 70, 76 (1980) (citations omitted). Although Hill would have this Court review each of the prosecutor's comments in a vacuum, we must examine the summation in its totality. *See Commonwealth v. Carpenter,* 533 Pa. 40, 49, 617 A.2d 1263, 1265 (1992) ("remarks made by a prosecutor must be evaluated in the context in which they occur."). Based on the foregoing consid-

determine the appropriate sentence. (N.T. 4/7/92, 4, 37). These allegations are unquestionably frivolous.

erations, we find that the prosecutor's closing argument was not inflammatory or prejudicial.

■ Hill takes exception to the prosecutor's suggestion that her tears during the penalty phase were for herself rather than for her victims or their families. This was proper in light of the fact that Hill expressed no remorse during the guilt phase of trial and steadfastly maintained that she had been falsely accused by her friends and framed by the police. *See Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984) (no error where prosecutor commented on defendant's lack of remorse during penalty phase of capital trial).

■ We likewise do not find merit to Hill's assertion that the prosecutor implied to the jury that it should impose the death sentence out of sympathy for the families of the victims.[12] The challenged comment suggested only that if Hill appealed to the jury to impose a life sentence based on sympathy, that the jury should reject it. This was not improper.[13] *See id.* at 500–01, 467 A.2d at 301.

■ Accordingly, we conclude that the prosecutor's closing argument, when viewed in its entirety, did not have the effect of inflaming the passions of the jury nor did it impede their ability to objectively evaluate the evidence presented during the sentencing hearing.[14]

12. The challenged comments by the prosecutor consisted of the following: "[T]he defense may talk to you, ladies and gentlemen, about sympathy, sympathy for a young woman, sympathy for someone who has children. Well, if there's any sympathy that belongs anywhere in this courtroom, ladies and gentlemen, it belongs there on the first row [with the family members of the victims]." (N.T. 4/7/92, 46).

13. This reasoning applies equally to Hill's complaint that the prosecutor improperly told the jury that it should not be swayed by Hill's sex or age when it deliberated over the appropriate sentence.

14. Although Hill complains that she was prejudiced by the prosecutor's reference to the fact that one of the robbery victims "did not comprehend the English language," she fails to specify how she was harmed. We are unable to discern how this comment could have affected the jury's objectivity in this case.

■ The final issue raised in this appeal is a claim of ineffectiveness of trial counsel whereby Hill argues that counsel should have requested that the court instruct the jury on the definition of "significant history" as it applies to the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(9). Hill concedes that she had two prior robbery convictions, but submits that the vagueness of the phrase "significant history" provides uncertainty as to whether her two convictions fit within the definition.[15]

This Court has repeatedly rejected the claim that 42 Pa.C.S. § 9711(d)(9) is unconstitutionally vague. *Commonwealth v. Rivers,* 537 Pa. 394, 644 A.2d 710 (1994); *Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689 (1986); *Commonwealth v. Goins,* 508 Pa. 270, 495 A.2d 527 (1985); *Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730 (1984). Additionally, in *Commonwealth v. Rivers, supra,* the appellant raised an identical challenge to the trial court's failure to define the meaning of "significant history" of felony convictions. Defense counsel in *Rivers* had requested the trial court to find, as a matter of law, that the appellant's prior record of two aggravated assaults could not be considered a *significant* history of felony convictions. In affirming the trial court's refusal of that request, we noted that it was the function of the jury to determine whether the appellant's record of two prior aggravated assaults constituted a significant history of felony convictions. 537 Pa. at 413, 644 A.2d at 719.

Likewise in the instant case, it was solely within the province of the jury to determine whether Hill's two prior convictions for robbery served as a sufficient basis to conclude that she had a significant history of felony convictions. Any request seeking to have the court elaborate on what constitutes a "significant history" would therefore have been refused on that basis. Accordingly, because this claim is without merit, Hill's allegation of ineffectiveness must fail.

15. In another obvious misrepresentation of the record, Hill's brief makes the claim that "[n]o mitigating circumstances were ever mentioned by the judge, only the aggravating ones." Brief for Appellant at 46. As stated previously, the trial court's instructions to the jury fully comported with the guidelines set forth in the death penalty statute.

316 

 Our review of the record reveals that the sentence imposed was not the product of passion, prejudice, or any other arbitrary factor. Further, the three aggravating circumstances found by the jury in this case are all supported by evidence in the record. The jury found that Hill committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); that she had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and that she had been convicted of another murder, committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). Both victims were murdered during the commission of robberies in which Hill stole items of personal property which she later exchanged for money and drugs. Hill had previously committed two other robberies, each involving the use of force against an older woman. Finally, the jury had convicted Hill of two counts of first degree murder during the guilt phase of trial thereby establishing the basis for the third aggravating circumstance.

Lastly, the information compiled by the Administrative Office of Pennsylvania Courts indicates that the sentence imposed in this case is not disproportionate to the sentence imposed in similar cases.

Judgement of sentence affirmed.[16, 17]

MONTEMURO, J., is sitting by designation.

16. The prothonotary of the Supreme Court is directed to transmit the full and complete record in this case to the Governor. 42 Pa.C.S. § 9711(i).

17. This matter is hereby referred to the Disciplinary Board to review the concerns expressed in notes eight and fifteen, *supra,* as well as the remainder of the Brief for Appellant submitted to this Court.