937 A.2d 1062

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Mikal MOORE, Appellant.**

Supreme Court of Pennsylvania.

Argued April 11, 2005.

Re–Submitted Nov. 21, 2006.

Decided Dec. 28, 2007.

622

Larry Feinstein, for Mikal Moore, appellant.

**624**

Amy Zapp, Harrisburg, Hugh J. Burns, Jr., Catherine Lynn Marshall, Philadelphia Dist. Attorney's Office, for the Com. of PA.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice SAYLOR.

This is a capital direct appeal. The background is as follows.

Sometime before midnight on January 17, 1998, Appellant, Andrea Kinney, and Michael Mobley summoned an unlicensed taxicab, or a hack, to take them from North to West Philadelphia, in the vicinity of 60th and Market Streets. Kinney and Mobley separated from Appellant briefly. When they regrouped, Appellant complained that he had been "stolen" or "sucker punched" by a person whom he had previously robbed. Appellant, Kinney, and Mobley returned to the hack and, at Appellant's direction, the driver set out in pursuit. When he saw his quarry, twenty-two-year-old Donald Burroughs, Jr., Appellant exited the vehicle and gave chase on foot. Kinney and Mobley followed at some point and heard Appellant fire a shot. Appellant said, "Look up at me," and fired two more shots, and Mr. Burroughs was fatally wounded in the encounter. Appellant, Kinney, and Mobley left in the hack and subsequently fled to Wilmington, Delaware.

The police investigation soon centered on Appellant, Kinney, and Mobley. Kinney was interviewed by homicide detectives after he returned to Philadelphia, and he provided a statement implicating Appellant. After an arrest warrant was issued, Appellant was detained and returned to Pennsylvania.

At trial, the Commonwealth sought to prove that Appellant's motivation for the killing flowed from the victim's conduct in defending himself, after having suffered a long-term course of assaults, bullying, and taunting by Appellant. Appellant's counsel advanced an oral motion *in limine* to pre-

clude at least a portion of this line of questioning, on the basis that it was irrelevant, outside the scope of discovery, and constituted impermissible hearsay. The trial court denied the motion, and the Commonwealth presented testimony from the victim's father, Donald Burroughs, Sr., his sister, Martina Burroughs, and Saltzer Davis, a police officer and long-time friend of the victim's, which included various hearsay references to the victim's complaints of having been robbed, assaulted, and bullied by Appellant since childhood. The Commonwealth also adduced testimony from Kinney, Mobley, and the hack driver, who all implicated Appellant as the killer. Several residents testified to having heard the gunshots, with one having seen Appellant returning to the hack after the shooting, and another having overheard the statement, "Look up at me," between the first shot and the next two. Police officers and detectives described the response to the shooting and the course of their investigation and read Kinney's and Mobley's statements into the record. A ballistics expert confirmed that the two bullet wounds to the victim's body were fired from the same gun, and a medical examiner offered a description of the victim's wounds, one of which included a piercing of the victim's heart. Finally, Kinney's brother testified that, while in jail, Appellant indicated that he would beat him and arrange for Kinney to be stabbed if Kinney continued to "snitch."

Appellant's attorney cross-examined the Commonwealth witnesses, but the defense offered no evidence of its own. After the guilt-phase evidentiary record was closed, the jury found Appellant guilty of first-degree murder and possession of an instrument of crime.

At the penalty phase, the Commonwealth pursued one aggravating factor, namely, that Appellant had a significant history of felony convictions involving the use or threat of violence to the person. *See* 42 Pa.C.S. § 9711(d)(9). In support of this aggravator, the Commonwealth presented evidence of two juvenile adjudications for robbery and conspiracy, including testimony from one of the victims that he was beaten, stomped, and kicked. A police officer who investigat-

ed the other robbery related that the victim was covered with a coat, held by force, and told that he would be shot in the head if he did not cooperate. Appellant sought to establish two mitigating factors, his age at the time of the offense, 42 Pa.C.S. § 9711(e)(4), and the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8).

After deliberating for approximately two hours, the jurors indicated to the trial judge that they were deadlocked, with eleven jurors favoring a verdict and one juror as the holdout. After inquiring as to the nature of the jury's numerical division, the court declared that insufficient time had been dedicated to the deliberative effort and instructed the jurors to, "[g]o back, have open minds, try to deliberate and see if you can make the agreement unanimous." The jury returned approximately three hours later with a unanimous verdict for death. According to the foreperson, the jury unanimously found the aggravating factor and no mitigating factors. *See* N.T., July 2, 1999, at 7–8.

Trial counsel filed post-sentence motions and, subsequently, substitute counsel filed amendments, which included allegations of ineffective assistance of counsel. Prior to resolution of the motions, the trial judge died, and the matter was reassigned. The court entertained argument on Appellant's post-sentence motions, although it did not conduct an evidentiary hearing, and denied relief on all of Appellant's claims. Appellant filed a notice of appeal.

Presently, Appellant argues that the trial court erred in: admitting other-bad-acts evidence in the form of testimony from Appellant's father, his sister, and Officer Davis concerning prior assaults and bullying perpetrated against the victim by Appellant, over objections based on prejudicial impact and hearsay; permitting a detective to testify concerning "word on the street" implicating Appellant in the killing; allowing the Kinney and Mobley statements to be read into evidence; permitting the admission of "good character" evidence concerning the victim; failing to instruct the jurors concerning the use of other-bad-acts evidence; issuing an overly-restrictive charge regarding voluntary intoxication; allowing the

Commonwealth to pursue the Section 9711(d)(9) aggravator based solely on two juvenile robbery adjudications; failing to issue an instruction under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); misstating the purport of a life sentence in Pennsylvania; and coercing the holdout juror in his response to the announcement that the jury was hung. Further, Appellant asserts that the prosecutor engaged in misconduct by calling for justice in her guilt-phase closing based on the other-bad-acts evidence.

■ Appellant concedes that his trial counsel did not raise objections to the "word on the street" references, the admission of Kinney and Mobley's statements, the asserted references to the victim's good character, the prosecutor's closing statement, and the jury instructions on voluntary intoxication. Since the appeal was filed after the decision in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), which abolished the relaxed waiver doctrine in capital direct appeals filed after the date of the decision's entry, *see id.* at 560–61, 827 A.2d at 403, relaxed waiver is not available. Therefore, the waived claims may be considered, if at all, only as components of a challenge to trial counsel's stewardship. *See Commonwealth v. Uderra,* 580 Pa. 492, 500–01, 862 A.2d 74, 79 (2004).

■ With regard to such challenges, as well as another that Appellant has raised solely through ineffectiveness,[1] in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), this Court held that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* 572 Pa. at 67, 813 A.2d at 738. While the trial court relied on *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), to consider the ineffectiveness claims, *see* Trial Court Opinion, at 10 n. 1, the *Bomar* exception to the *Grant* rule applies only in instances in which the post-sentence court conducts an evidentiary hearing. *See Commonwealth v. Mitchell,* 576 Pa. 258, 269, 839 A.2d 202, 208 (2003) ("Taking into account the strong preference set forth in *Grant* to

1. This is that trial counsel was ineffective for eliciting from a detective that Appellant exercised his right to remain silent and declined to make a post-arrest statement.

postpone review of all ineffectiveness claims to the collateral process, and the limitation of the exception allowed in *Bomar* to consider only those ineffectiveness claims where the lower court conducted a hearing and provided a full consideration of the issue, we believe the claims raised in this case are best left to the collateral stage."). Since no such hearing was conducted in this case, Appellant's claims of ineffectiveness of counsel will be dismissed without prejudice to his ability to pursue them on collateral review. *See* 42 Pa.C.S. § 9543(a)(2)(ii).[2]

## I. Sufficiency of the Evidence

In all capital cases, we review evidentiary sufficiency. To establish the offense of first-degree murder, the Commonwealth must prove the fact of the killing, the defendant's involvement, and malice and specific intent to kill on the part of the defendant. *See Commonwealth v. Collins,* 550 Pa. 46, 50, 703 A.2d 418, 420 (1997). Further, specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *See Commonwealth v. Speight,* 544 Pa. 451, 459, 677 A.2d 317, 321 (1996). In this assessment, the evidence is viewed in the light most favorable to the Commonwealth, as the verdict winner. *See Speight,* 544 Pa. at 459, 677 A.2d at 321.

Here, the evidence offered at trial is plainly sufficient to support the first-degree murder conviction. For example, the testimony of Kinney, Mobley, and the hack driver implicated Appellant as the killer. All related that Appellant chased the victim, and Mobley testified that, after hearing several gunshots, he saw Appellant standing over the victim. Further, Kinney and Mobley indicated, in substance, that after the killing, Appellant confessed to having shot the victim. While, as noted, there were inconsistencies among these witnesses with regard to some of the details, and their

2. Appellant observes that testimony from his trial counsel cannot be presented on post-conviction review, because his trial counsel has died. Nevertheless, as a post-conviction petitioner's counsel may wish to present other forms of evidence concerning the stewardship of the petitioner's trial counsel, we decline to expand *Bomar* to encompass the present circumstances.

involvement in the events may have been a factor to be evaluated in judging their credibility, such matters were properly committed to the jurors for resolution. The manner in which the victim was killed (two gunshot wounds to his back, one of which penetrated his heart) constitutes circumstantial evidence of malice and specific intent to kill on Appellant's part, and various aspects of subsequent conduct on Appellant's part, including his flight and threats directed to a witness, evidence his consciousness of guilt.

Concerning his death sentence, Appellant challenges the sufficiency of the evidence supporting the Section 9711(d)(9) aggravating factor.[3] Although Appellant does not contend that his juvenile robberies were not felony matters, see 18 Pa.C.S. § 3701 (prescribing felony grading for robbery), he argues that they were graded below first-degree felonies, and, therefore, do not rise to the level of a significant history of violent felonies for purposes of the (d)(9) aggravator. Appellant acknowledges this Court's precedent holding that a juvenile adjudication may be considered as a "conviction" for purposes of establishing that a defendant has a significant history of felony convictions pursuant to the (d)(9) aggravating factor. See Commonwealth v. Baker, 531 Pa. 541, 565–68, 614 A.2d 663, 675–76 (1992). Appellant, however, emphasizes that the defendant's juvenile record in Baker indicated that he had one robbery and five burglary adjudications. See Baker, 531 Pa. at 564–65, 614 A.2d at 675. Appellant argues that, in contrast, he has only two juvenile adjudications. In addition, Appellant attempts to distinguish two prior adult convictions for robbery, which this Court has held to be sufficient evidence in Commonwealth v. Hill, 542 Pa. 291, 315, 666 A.2d

---

**3.** Although this challenge is framed as an ineffectiveness claim in the body of Appellant's brief, trial counsel made a motion *in limine* to strike the (d)(9) aggravator at the beginning of trial and subsequently renewed his request prior to the commencement of the penalty phase. *See* N.T., June 8, 1999, at 1–5; N.T., July 1, 1999, at 7–11. To the degree that the underlying challenge is not properly presented, we examine the sufficiency of the evidence in any event, as we are obliged determine whether the evidence supports the finding of at least one aggravating factor. *See* 42 Pa.C.S. § 9711(h).

642, 654 (1995), from his two juvenile robbery adjudications, which he suggests should be regarded as less probative.

In light of this Court's prior holdings, Appellant's argument goes to the weight, and not to the sufficiency, of the evidence. Since, under *Baker*, juvenile adjudications are "convictions" for purposes of the (d)(9) aggravator, and, under *Hill*, two convictions for violent felonies are sufficient to implicate a jury issue, we conclude that the evidence offered by the Commonwealth was sufficient to support the (d)(9) aggravator. *Accord Hill*, 542 Pa. at 315, 666 A.2d at 654 (observing that "it was solely within the province of the jury to determine whether [the appellant's] two prior convictions for robbery served as a sufficient basis to conclude that she had a significant history of felony convictions").[4]

## II. Guilt Phase Claims

### A. Other Bad Acts

█ Concerning the testimony of Donald Burroughs, Sr., Martina Burroughs, and Saltzer Davis to the effect that, over an extended course of time, Appellant had robbed, assaulted, and bullied the victim, Appellant first argues that the trial court failed to weigh the probative value of the evidence against its potential for prejudice. Although Appellant acknowledges that evidence of prior bad acts may be admissible to complete the story of the case or to show motive, ill will, or malice, *see* Pa.R.E. 404(b)(2), he maintains that such evidence may only be admitted "upon a showing that the probative value of the evidence outweighs its potential for prejudice." *See* Pa.R.E. 404(b)(3).

Upon our review of the record, we note that the trial court, Appellant's counsel, and the prosecutor engaged in a lengthy discussion regarding his objection to the other-bad-acts evi-

---

4. Appellant does not couch his argument in terms of the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (precluding capital punishment for juvenile offenders under eighteen years of age). We note only that several other jurisdictions have determined that *Roper* does not foreclose the use of juvenile adjudications to establish aggravating factors. *See, e.g., England v. State*, 940 So.2d 389, 407 (Fla.2006).

dence. *See* N.T., June 15, 1999, at 34–83. At the outset of his comments, Appellant's trial counsel took the position that the evidence was "not germane, not relevant, not probative and nothing more than prejudicial ... unless the Commonwealth is able to properly present to the Court a systematic and recent and relevant pattern or course of conduct which is the only way that it can come in for purposes of a murder charge." *Id.* at 34–36. When the district attorney met this objection with the explanation that other evidence would show that connection between the long-term bullying and the killing, *see id.* at 37 (reflecting the prosecutor's explanation that "the essence of the killing on that night is Donald finally was able to hit [Appellant] back and as a direct result of that this defendant went and recruited his cronies to go back and kill him"), trial counsel seemed to shift the basis for his objection to a claimed discovery violation, *see id.* at 37–39, 42 ("My main point, Your Honor, is that the Commonwealth cannot go outside discovery."), then to an asserted violation of the rule against hearsay, *see id.* at 70–76. Further, at several points in the discourse, counsel indicated that it was within the trial court's discretion to admit the evidence. *See id.* at 39 ("If the Court wants to allow it that's the Court's discretion."), 75 ("I leave it to the Court's infinite discretion ...").

Given the disjointed, shifting, and concessionary nature of counsel's presentation, we cannot fault the trial court for failing to offer a specific ruling balancing the probative value of the other-bad-acts evidence against its prejudicial effect.

## B. Hearsay

 Appellant also challenges the admissibility of a substantial portion of the testimony of the victim's father, Ms. Burroughs, and Officer Davis on the basis that their testimony constituted inadmissible hearsay.[5] In this regard, Appellant

5. Appellant raises this issue, in part, as a claim of ineffective assistance of counsel for failing to raise a hearsay objection at trial. *See* Brief for Appellant at 11. As noted, however, Appellant's trial counsel made an oral motion *in limine* to exclude this testimony, which preserved this issue for appeal. *See* Pa.R.E. 103(a)(1) (requiring, as a prerequisite to preservation of a claim of trial court error in the admission of evidence,

explains that these statements were made out of court and were offered for their truth, *i.e.,* as substantive evidence that Appellant had bullied the victim on previous occasions. *See* Pa.R.E. 801(c). He observes that such statements are inadmissible unless they fall within one of the enumerated exceptions to the hearsay rule. *See* Pa.R.E. 802. Specifically, Appellant argues that the trial court erred in admitting this evidence under the state of mind exception to the hearsay rule, which allows a court to admit evidence relating to the following:

> **(3) Then existing mental, emotional, or physical condition.**
>
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only as it relates to the execution, revocation, identification, or terms of declarant's will.

Pa.R.E. 803(3). Appellant maintains that the testimony does not qualify under the state of mind exception because the exception, on its plain terms, does not include such fact-bound statements concerning prior acts. *See United States v. Brown,* 490 F.2d 758, 775 (D.C.Cir.1973) (stating that, "to allow hearsay statements which relate past events on memory or belief under the state of mind exception would in effect swallow the hearsay rule."). According to Appellant, the Commonwealth was able to establish motive via the testimony from Kinney, Mobley, and the hack driver to the effect that Appellant had indicated that Mr. Burroughs had hit him, and that Appellant described Mr. Burroughs as someone he had previously robbed. Appellant therefore regards the testimony of the victim's family and friend as surplusage, which might likely have been improperly interpreted by the jurors as

a timely objection, motion to strike or the use, *inter alia,* of a motion *in limine* asserted as of record to preserve a claim of trial court error). In addition, the Commonwealth recognizes that the hearsay objection was raised. *See* Brief for Appellee at 11.

evidence of violent propensity on Appellant's part. *See* Rule 404(b)(1) (providing that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith.").

Appellant further contends that the testimony was not admissible as state of mind evidence because it was not relevant to any issue in the case. *See* McCormick on Evidence, § 276, 281 ("The victim's emotional state must relate to some legitimate issue in the case."). In this regard, he observes that the Commonwealth must demonstrate that the killing was willful, deliberate, and pre-meditated. *See* 18 Pa.C.S. § 2503(a). Thus, Appellant argues that it is the defendant's state of mind, rather than the victim's, that is relevant in proving that Appellant committed a willful, deliberate, and premeditated killing. Moreover, Appellant explains that he did not present any defense, such as self defense or accident, that would implicate the victim's state of mind. *See* *Brown*, 490 F.2d at 767 (explaining that state of mind evidence is relevant where an issue of self defense, suicide, or accidental death is raised by the defendant). Instead, Appellant's defense strategy was to attempt to establish reasonable doubt as to the identity of the shooter. Unlike self defense, this strategy does not involve any issue concerning the victim's state of mind. In addition, Appellant contends that the victim's state of mind was not relevant even under the Commonwealth's theory of the case, namely, that Appellant became enraged and shot the victim "execution-style."

The Commonwealth, by contrast, maintains that the victim's statements to his father, sister, and friend regarding the ongoing bullying by Appellant were admissible under the state of mind exception to the hearsay rule in order to establish the presence of ill will, malice, or motive for the murder. The Commonwealth explains that this evidence was relevant to its theory of the case, namely, that Appellant was furious that a person whom he had bullied for years had the audacity to fight back. In this regard, the Commonwealth relies upon this Court's decision in *Commonwealth v. Fletcher*, 561 Pa. 266, 293, 750 A.2d 261, 276 (2000), which held that a homicide

victim's out-of-court statement regarding his relationship with the defendant was admissible for such purposes. *See also Commonwealth v. Stallworth*, 566 Pa. 349, 364, 781 A.2d 110, 118 (2001) (holding that evidence concerning a victim's perception of her deteriorated relationship was relevant as to the appellant's intent and motive in a first degree murder trial). The Commonwealth asserts that the statements in the present matter are also encompassed by the state of mind exception because they are evidence of Appellant's motive.

The admissibility of evidence relating to a victim's state of mind has been a subject of difference in this Court's recent decisions.[6] Some decisions have taken a broad view of the admissibility of such evidence. For example, in *Stallworth*, 566 Pa. 349, 781 A.2d 110, the Commonwealth sought to admit evidence that the victim filed a petition for relief under the Protection From Abuse Act, 23 Pa.C.S. §§ 6101–6117. In that petition, the victim made three separate allegations concerning threats made to her by the appellant. A majority of the Court held that the trial court did not err in admitting the victim's statements as evidence of her relationship with the appellant and to demonstrate the malice and/or ill-will that she perceived. *See Stallworth*, 566 Pa. at 362–63, 781 A.2d at 117. Additionally, in *Fletcher*, 561 Pa. 266, 750 A.2d 261, this Court determined, in the context of an ineffectiveness of counsel claim, that a homicide victim's statement concerning his relationship with the defendant was relevant to demonstrate the victim's state of mind, thus establishing the presence of ill will, malice, or motive for the killing. Therefore, the Court concluded that the statement was admissible under the state of mind exception. *See Fletcher*, 561 Pa. at 293, 750 A.2d at 276.

Other cases, by contrast, have taken a more limited view of the state of mind exception. In *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981), the Court held that the

6. Parenthetically, Mr. Justice Castille is correct in asserting, in his concurrence, that several types of non-hearsay statements have been categorized under the umbrella of "state of mind" declarations. Here, our treatment of Appellant's hearsay objection is limited to the hearsay application (*i.e.*, the application of the state of mind exception to the rule against hearsay to overcome a hearsay objection).

victim's statement regarding his fear that the defendant "was after" him was inadmissible because the victim's state of mind was not at issue in the case. *See Thornton,* 494 Pa. at 265, 431 A.2d at 251. In this regard, the Court reasoned that, "[i]t was [the appellant's] state of mind, not that of the victim, which was material to establish the degree of guilt, if any, of the charge of criminal homicide." *Id.* at 265, 431 A.2d at 251. Significantly, the Court observed that the victim's statement could only be relevant as circumstantial evidence of the appellant's intent to kill if the testimony was offered for its truth; the Court explained, however, that if the testimony was offered for its truth, it would be inadmissible as hearsay because it did not fit within any hearsay exception. *See id.* at 265, 431 A.2d at 251.

More recently, the Court relied upon the reasoning of *Thornton* in *Commonwealth v. Laich,* 566 Pa. 19, 777 A.2d 1057 (2001), to conclude that the victim's belief regarding her relationship with the appellant was irrelevant to the issue of the appellant's degree of guilt. Instead, the Court observed that only the appellant's state of mind was relevant as to whether he committed the crimes with premeditation or whether he was acting in the heat of passion. *See id.* at 28, 777 A.2d at 1062; *accord Commonwealth v. Auker,* 545 Pa. 521, 547, 681 A.2d 1305, 1319 (1996) (stating that, while evidence of a victim's fear of a defendant may be relevant to a kidnapping charge, such evidence is "irrelevant to the charge of criminal homicide").

The Commonwealth relies exclusively on *Fletcher* in arguing that the state of mind exception clearly encompasses statements such as those made by the victim in the present matter. *Fletcher's* broad approach to the admissibility of hearsay evidence touching on a victim's state of mind in a criminal homicide prosecution is in substantial tension with the limitations described and applied in the subsequent decisions of the Court. Even those decisions adopting a broader view of the state of mind exception support the proposition that statements offered as evidence of a declarant's state of mind may not be admitted for their truth. In *Stallworth,* for example,

this Court held that while the victim's statements contained in the PFA petition could be offered as evidence that the victim feared the appellant, the statements could not be admitted as substantive evidence that the appellant committed the acts described in the petition. *Stallworth,* 566 Pa. at 363–64, 781 A.2d at 118. In so concluding, the Court noted that "an out-of court statement by a murder victim may be admitted to establish the motive of the defendant *when those statements are not offered to prove the truth of the matter asserted." Id.* at 364, 781 A.2d at 118 (emphasis added); *accord Laich,* 566 Pa. at 28 n. 3, 777 A.2d at 1062 n. 3.

In the present matter, the testimony of the victim's father, sister, and friend contained statements made by the victim concerning bullying by Appellant. While under some of this Court's decisions, these statements would be admissible as circumstantial evidence of the victim's fear of Appellant, they could not properly be admitted as substantive evidence of these prior incidents over Appellant's hearsay objection. *See Brown,* 490 F.2d at 763 (reasoning that, factual statements offered as circumstantial evidence of a declarant's state of mind "are to be considered solely on the issue of the declarant's mental state and not for the truth of the matters contained therein"). Although the Commonwealth sought to adduce the victim's statements concerning Appellant's prior acts as circumstantial evidence to establish the victim's fear, the prosecutor further employed this evidence to establish that Appellant became enraged at the victim because, after years of abuse, he had the "effrontery" to fight back. The testimony concerning Appellant's intimidation and bullying of the victim over the course of a number of years was plainly relevant to Appellant's motive only to the degree that the hearsay statements were true.

Moreover, the Commonwealth specifically and substantially relied upon their truth at trial, as reflected both in the prosecutor's arguments concerning admissibility, *see, e.g.,* N.T., June 15, 1999, at 43, 45, and in her closing remarks, as follows:

[Appellant] wanted his victim, someone who he had victimized over and over and over again without any feeling of remorse, without any care, he wanted his victim one last time to know, I got you. I want you to see it coming. That's personal. That's [Appellant].

\* \* \*

We started, Ladies and Gentlemen, with the motive. And you know something, I don't have to prove motive. That is not the same thing as intent. But motive lets you know why, why this happened, although quite frankly the why is never enough. [The victim] was the defendant's prey. He enjoyed taunting him, robbing him, assaulting him. [The victim] correctly feared this defendant up to the day he died. And for that [the victim] was ridiculed once again. . . . Do we not remember [the victim's father] said from the very beginning that [Appellant] was a problem for his son? [The victim's sister] told you he used to try to bully my brother every time he saw him. Every time. Not just one little fight some time ago. That is not what we're talking about here. That evidence was given to you so that you knew what ill will there was, what malice there was in this man and how he treated [the victim]. It tells you the why. The events that happened after that go further because to understand a bully, this bully, and how he acted when [the victim] finally, vainly tried to defend himself, is to understand how the end came.

N.T., June 28, 1999, at 44–46. The Commonwealth's allusions to the victim's state of mind in this passage and otherwise are tangential, and it is readily apparent that the state of mind hearsay exception was used as a conduit to support the admission of fact-bound evidence to be used for a substantive purpose.[7]

7. We respectfully differ with Justice Castille's assertion that our present decision overrules *Fletcher*. *See* Concurring Opinion at 647, 937 A.2d at 1079. In the first instance, as developed above, the existing and subsequent *Stallworth* and *Laich* decisions already curtail an expansive reading of *Fletcher's* reasoning. Further, *Fletcher's* reasoning is explicitly directed to the use of victim state-of-mind evidence to establish *the victim's* state of mind. *See Fletcher*, 561 Pa. at 293, 750 A.2d at 276

As we have concluded that the trial court erred in admitting the hearsay testimony, we turn to the issue of whether the admission of evidence amounted to harmless error. We recognize that the Commonwealth has the burden of proving beyond a reasonable doubt that the error could not have contributed to the verdict, *see Commonwealth v. Mitchell*, 576 Pa. 258, 280, 839 A.2d 202, 214 (2003), and that it does not offer a harmless error argument in its brief. Nonetheless, an appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee. *See Commonwealth v. Parker*, 591 Pa. 526, 534–35, 919 A.2d 943, 948 (2007). An error may be deemed harmless, *inter alia*, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *See Commonwealth v. Young*, 561 Pa. 34, 85, 748 A.2d 166, 193 (1999).

Here, the testimony of Kinney, Mobley, and the hack driver implicating Appellant was largely consistent in critical details. Although the credibility of these witnesses before the jury might have been impacted by their involvement in pursuing the victim, notably, Appellant's presence in the vicinity of the killing immediately after the shots were fired was corroborated by an independent witness. Moreover, Appellant presented no evidence to counter the Commonwealth's presentation in these regards. *Compare Young*, 561 Pa. at 87, 748 A.2d at

("The victim's statement to Williams was relevant in establishing *the victim's state of mind* regarding his relationship with appellant and was therefore admissible under the state of mind hearsay exception to establish 'the presence of ill will, malice or motive for the killing.' " (emphasis added)). We do not read the opinion as granting authorization to engage in a wholesale diversion of the focus from the victim's state of mind to proof of underlying facts, as occurred here.

Finally, in response to Justice Castille's indication that our present forfeiture by wrongdoing exception to the hearsay rule embodied in Rule of Evidence 804(b)(6) encompasses a killing based on personal animosity, we note that such position was squarely rejected by a majority of the Court in *Laich*, 566 Pa. at 28–29 n. 4, 777 A.2d at 1062 n. 4. Therefore, further discussions concerning the matter are best reserved to the rulemaking process.

194 (finding that an error could not be deemed harmless, where the Commonwealth's central evidence was contradicted, *inter alia*, by testimony from the defendant). In terms of the degree of prejudicial effect, it is also significant that the improperly admitted hearsay evidence was substantially similar to evidence that was properly admitted in the case. This included testimony from the victim's sister and Officer Davis that was based on first-hand knowledge,[8] as well as Kinney's, Mobley's, and the hack driver's testimony that Appellant indicated that he had previously robbed the victim.[9] Indeed, in his brief, Appellant suggests that the latter line of evidence substantially overlapped with the testimony of the victim's father, sister, and friend. *See* Brief for Appellant at 10 ("The Commonwealth had three other witnesses—Andrae Kinney, Michael Mobley and [the hack driver]—who virtually echoed one another in their assertions that Appellant had admitted that he robbed the deceased previously, that the deceased sucker punched him, and that Appellant would track him down and shoot him. The Commonwealth thus clearly could provide the jury with motive, malice and ill will and more without the Burroughs family and Davis."). Notably, in light of these overlaps, the prosecutor could have made essentially the same argument to the jury without the need to refer to hearsay statements.

We acknowledge Appellant's argument that the Commonwealth's presentation of nearly a full day of testimony from the victim's father, sister, and friend, which included numerous hearsay references to assaults and harassment, could have been taken by the jurors as evidencing his propensity for violence. In light of this emphasis, we regard this as a close case. The possibility of prejudice from hearsay references suggesting propensity could have been mitigated, however, by a limiting instruction from the trial court. Since trial counsel

8. Officer Davis testified that he witnessed Appellant beat the Mr. Burroughs when they were children. Ms. Burroughs personally observed intimidating gestures and derogatory statements made by Appellant towards her brother.

9. While this evidence was also hearsay, the underlying declaration qualifies for entry into evidence as an admission. *See* Pa.R.E. 803(25).

did not request such an instruction, we will reserve final judgment concerning the impact of trial counsel's failure in this regard, a matter which is to be deferred to post-conviction review under the *Grant* decision. Our holding here is merely that the evidence of Appellant's guilt was sufficiently overwhelming, and the impact of the trial court's error so insignificant by comparison, that the verdict was not rendered unjust by the trial court's error in admitting the hearsay evidence standing alone.

### III. Penalty Phase Claims

**A. Life Means Life**

 With regard to the penalty phase, Appellant first argues that the trial court failed to provide an instruction pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 155, 114 S.Ct. 2187, 2189, 129 L.Ed.2d 133 (1994) (holding that a the trial court must instruct the sentencing jury that the defendant is parole ineligible when the defendant's future dangerousness has been put at issue and where the state's sentencing scheme does not allow for parole in the event of a life sentence). Appellant maintains that the Commonwealth put his future dangerousness at issue. In this regard, Appellant contends that the Commonwealth emphasized his escalation of violence against Mr. Burroughs, and described him as a "predator" who has "graduated" to more and more serious crimes. Appellant thus asserts that he was entitled to a *Simmons* instruction. The Commonwealth, by contrast, maintains that Appellant's challenge is waived because trial counsel failed to lodge an objection at trial.

The Commonwealth is correct in this regard. Since trial counsel did not request a *Simmons* instruction at trial, Appellant's challenge is waived.

 In the alternative, Appellant argues that, even if he was not entitled to a *Simmons* instruction, he was entitled to have the trial court provide an accurate explanation of Pennsylvania law to the jury. In this regard, Appellant refers to several passages from the record in which the trial court

explained the meaning of life imprisonment. For instance, during his closing, trial counsel stated that: "Life is life. Life isn't ten years or 20 years or 30 years." Upon an objection by the Commonwealth, the trial court explained that:

Let me say something. That is not so. There is a procedure in Pennsylvania that takes place in the executive branch of the government, State Board of Pardon and Parole created by the governor. Governor's statutory act as taken, executive branch of government can cause a release before the termination of an inmate's life if he receives life. It's a falsehood and an incorrect statement. Life does not mean life in Pennsylvania.

N.T., July 1, 1999, at 91. At the conclusion of counsel's closing, the trial court stated the following in the presence of the jury: "Trial Court will now instruct the jury as to the possibility of parole where the law clearly arises from the arguments of either counsel in the penalty phase of the capital case." N.T., July 1, 1999, at 96.

After beginning its deliberations, the jury subsequently submitted a question concerning the meaning of life imprisonment in Pennsylvania and the following exchange occurred:

The Foreman: Your Honor, does life imprisonment mean life and one day meaning that the defendant does not get out?

The Court: No. No. I told you this before you went out. Whether or not life means life is not up to me. I sentence him to life. Whether or not he gets out during the duration of the life is a decision made by the executive branch of the government, the governor of the Commonwealth of Pennsylvania and the Board of Pardons and Parole. There are no statutes on it. They handle how long he's going to stay there. So to say to you will life mean life, it would not necessarily mean that. Everybody's got a chance of being pardoned or paroled under the statutory machinery. And, dependent on what conditions are, I'll say no more. Life does not mean full life, okay. I explained that to you. If I said that to you I would by lying. There is statutory machinery permitting

the pardon board and the governor to release inmates that are serving life imprisonment, okay. Got it? So can I say to you life means life?

The Jury: No.

The Court: I don't want to get into the technicalities but life does not mean life in the sense that you're going to be absolutely assured that if somebody is sent to prison for life has [sic] a chance of being released it will be denied each and every time it's attempted, okay? Got it? That's all I have to tell you.

Trial Counsel: Not parole, pardon. He can't be parolled [sic].

N.T., July 1, 1999, 112–13.

Relying upon these passages, Appellant maintains that he was entitled to an accurate instruction on the meaning of life without parole and he contends that the trial court's erroneous explanation of life imprisonment rendered the sentencing verdict unreliable. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (explaining that the Eighth Amendment requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die"); *see also Simmons,* 512 U.S. at 161, 114 S.Ct. at 2192–93 (observing that "the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.").

The Commonwealth, in response, argues that Appellant's challenge is waived because counsel failed to raise an objection to the trial court's explanation at trial. Again, we agree with the Commonwealth. Counsel appears to have been satisfied with his effort to correct the trial court's admonition to the jurors and did not register an objection. Accordingly, Appellant's challenge is not reviewable at this juncture.

## B. Asserted Coercion in Deliberations

Finally, Appellant contends that the trial court erred by instructing the jury to continue its deliberations after it had indicated that it was deadlocked. Specifically, Appellant refers to the following exchange that occurred between the trial court and the jury:

The Foreman: We have come to a hung or a deadlock. The jurors have voted 11 to 1 and we need your advice.

The Court: Well, let me put it this way, you said 11 to 1. I don't exactly know what you mean by 11 to 1.

The Foreman: On a verdict.

The Court: Well, it could mean a lot of things, 11 to 1. I don't know what you're talking about really as to 11 to 1. It could mean that you have 11 people agreeing to aggravating circumstances and one is not reaching the aggravating circumstance to make it a unanimous vote on that, it could be that 12 have found aggravating circumstances and one or more have found mitigating, one or both mitigating circumstances and that one of the 12 does not think that the aggravating outweigh the mitigating to justify death.

The Foreman: That's it, sir.

The Court: Pardon? That's it?

The Foreman: Yes.

The Court: That is what it is?

The Foreman: Yes.

The Court: Because it could be either B–1, B–2 or C–1, C–2. All right, look, realistically, you were out yesterday and the most you did yesterday after we heard all the arguments, *et cetera,* is you were out deliberating for less than an hour. This morning you all came in by 9:30 after you had been out for an hour this morning, you come back, you have been deadlocked, okay, after one hour so you haven't given it much of an effort beyond an hour, hour-and-a-half, okay. Go back, have open minds, try to deliberate and see if you can make the agreement unani-

mous. Continue your deliberations. An hour and-a-half does not make a sufficient reasonable length of time. N.T., July 2, 1999, at 4–5.

Appellant asserts that the trial court's instruction placed an impermissible burden on the holdout juror. In this regard, he maintains that the trial court, in effect, instructed the one holdout juror "to try to deliberate and see if you can make the agreement unanimous." Appellant further argues that he is entitled to relief under *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995).

In *Johnson*, this Court addressed a claim that the trial court abused its discretion by refusing to end jury deliberations in the penalty phase of a capital trial when the jury indicated that it was deadlocked after deliberating less than one full day. *See Johnson*, 542 Pa. at 407, 668 A.2d at 108. The *Johnson* Court observed that the trial's guilt phase spanned six days of testimony while the penalty phase encompassed an additional full day. When the jury indicated that it was deadlocked, the trial court reinstructed the jury on the aggravating and mitigating circumstances. Moreover, the trial court informed the jury that if it subsequently reported that it was hopelessly deadlocked, the court would impose a life sentence. Based upon the length of the trial, the importance of the matter under consideration, and the fact that the jury did not indicate to the court that it was hopelessly deadlocked, the Court concluded that the trial court did not err by ordering the jury to continue its deliberations. *See id.* at 408, 668 A.2d at 109.

Appellant contends that the facts here are materially different from the facts of *Johnson* and thus warrant a new penalty hearing. For instance, unlike in *Johnson*, the trial court in the present matter did not reinstruct the jury on the applicable aggravating and mitigating factors. In addition, Appellant maintains that the trial court erred by failing to instruct the jury that the court could sentence Appellant to life imprisonment if the court believed that further deliberations would not result in a verdict. Finally, Appellant finds it significant that

the jury panel in the present matter revealed the nature of its deadlock. All of these factors, Appellant contends, distinguish this case from *Johnson* and warrant a new penalty hearing.

The duration of jury deliberations is a matter within the sound discretion of the trial court, whose decision will not be disturbed unless there is a showing that the court abused its discretion or that the jury's verdict was the product of coercion or fatigue. *See Commonwealth v. Johnson*, 542 Pa. 384, 407, 668 A.2d 97, 108 (1995). Relevant factors in this assessment include the charges at issue, the complexity of the issues, the amount of testimony to consider, the length of the trial, the solemnity of the proceedings, and indications from the jury on the possibility of reaching a verdict. *See id.* at 407, 668 A.2d at 108.

Here, the guilt phase of the trial included six days of testimony, while the penalty phase encompassed an additional day. After receiving instructions to consider one aggravating factor and two mitigating factors, the jury deliberated less than two hours over the course of two days before indicating to the trial court that it was deadlocked. In similar cases, trial courts have properly directed juries to continue their deliberations when the issues are complex and where the deliberations are relatively brief. *See, e.g., Commonwealth v. Bridges*, 563 Pa. 1, 44, 757 A.2d 859, 882 (2000) (holding that the trial court did not abuse its discretion in instructing the jury to continue its deliberations after the jury had deliberated four hours). Notably, the jurors did not indicate that they were hopelessly deadlocked; rather, they requested the court's advice as to how to proceed. *See Johnson*, 542 Pa. at 408, 668 A.2d at 109 (finding it significant that the jury did not indicate that it was hopelessly deadlocked). Accordingly, the trial court did not err in instructing the jury to continue its deliberations after having deliberated less than two hours.

Appellant specifically advances several challenges concerning the content of the trial court's supplemental charge. As Appellant observes, the jury had revealed its numerical split to the trial court. When the jury voluntarily reveals such

information, a number of courts have observed that the judge has a heightened duty to avoid utilizing coercive language in its supplemental charge. *See, e.g., Desmond v. State,* 654 A.2d 821, 827 (Del.1994). Although the trial court sought further information concerning the nature of the jury's numerical division, *see* N.T., July 2, 1999, at 3–4,[10] the trial court did not utilize this information in the instructions that followed. Instead, the trial court focused upon the relatively brief amount of time that the jury had deliberated and instructed them to "[g]o back, have open minds, try to deliberate and see if you can make the agreement unanimous." N.T., July 2, 1999, at 5. Although Appellant maintains that the trial court was speaking solely to the holdout juror, we conclude that the trial court's instruction was directed to all of the jurors, particularly as the impetus for the instruction stemmed from the brief period of time that the jury had deliberated.

In addition, although Appellant asserts that the trial court erred by omitting several instructions in its supplemental charge, this Court has not developed any bright-line rules concerning the content of supplemental instructions.[11] Given that the jury had deliberated less than two hours, the trial court did not err by failing to reinstruct the jury concerning the mitigating and aggravating factors. Moreover, the court had previously explained that, in the event the jury was hopelessly deadlocked, it would impose a life sentence. Thus, viewing the totality of the circumstances, we conclude that the trial court did not abuse its discretion in instructing the jury to continue its deliberations. Moreover, we hold that the content of the trial court's supplemental instruction was not coercive or otherwise improper.

10. Appellant, however, does not challenge the trial court's instruction on that basis and, thus, the propriety of the trial court's inquiry is not presently before the Court.

11. Trial courts, however, should be guided by the American Bar Association's Standards for Criminal Justice, *see* AMERICAN BAR ASSOCIATION, ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY, Standard 15–5.4, (3d ed. 1996), which received a favorable recommendation by this Court in *Commonwealth v. Spencer,* 442 Pa. 328, 337–38, 275 A.2d 299, 304–05 (1971).

 Finally, according to Appellant, the trial court compounded its asserted error by indicating the wrong standard of proof for aggravating circumstances. *See* N.T., July 1, 1999, at 100 (reflecting the trial judge's comment "[t]wo or more [felonies] to make out a significant history [of violent felonies] if proven to your satisfaction by a preponderance of the evidence."). The trial court, however, subsequently stated the applicable standard correctly. *See id.* ("The Commonwealth must prove any aggravating circumstance beyond a reasonable doubt."). Moreover, this claim is also waived, since trial counsel did not lodge an objection.

## IV. Statutory Review

 Lastly, upon our review of the record, we are satisfied that the sentence of death was not the product of passion, prejudice, or any other arbitrary factor. *See* 42 Pa.C.S. § 9711(h).

The judgment of sentence is affirmed, and the Prothonotary is directed to transmit the record to the Governor of Pennsylvania within the timeframe designated by the Legislature. *See* 42 Pa.C.S. § 9711(i). Appellant's claims of ineffective assistance of counsel are dismissed without prejudice, in accordance with the above.

Jurisdiction is relinquished.

Chief Justice CAPPY and Justices BAER and FITZGERALD join the opinion.

Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice BALDWIN files a concurring opinion in which Justice FITZGERALD joins.

Justice CASTILLE concurring.

I join the Majority Opinion, with the exception of its discussion of the admissibility of testimony concerning the murder victim's out-of-court statements, detailing prior abuse that he had suffered at appellant's hands. Majority Op. at 631–38,

937 A.2d at 1069–73. The Majority finds that the trial court erred in admitting the testimony, albeit concluding that the error was harmless. In so holding, the Majority rejects the Commonwealth's reliance upon *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261 (2000), *cert. denied*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000) and the line of cases to which *Fletcher* belongs, all concerning the "state of mind" exception to the hearsay rule, cases which support the trial judge's ruling. Although the Majority does not say so directly, it effectively overrules this line of decisions and, instead, adopts the *Fletcher* dissenting opinion as the law of the Commonwealth. The Majority does not overtly discuss *stare decisis;* instead, the Majority paints *Fletcher* as an aberrant decision, undercut by decisions rendered before and after it.

As the author of the majority opinion in *Fletcher*, I most respectfully disagree with the Majority's isolation of that decision. *Fletcher* was grounded in existing case law and it appears that there was no request forwarded in that case to overrule that law. *See Fletcher*, 750 A.2d at 276, (citing *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000), *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, 1045 (1998), and *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 424–25 (1997), *cert. denied*, 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998)). Having said this, however, I have no objection to greater refinement and precision in this general area.[1] If it is so intended, I would make it clear that the Court is overruling the *Fletcher* line of cases to the extent they applied the state of mind exception to the hearsay rule. By the same token, I would emphasize that it is not accurate to say that the trial court "erred" in this matter. It is not error to implement existing case precedent.

One problem involving evidentiary questions in criminal cases is that much of this Court's case precedent arises in capital appeals. In the capital cases, the evidentiary question may be but one in a laundry list of complaints, often fact-specific, often supported by cursory adversarial representa-

---

1. I also join the Majority's harmless error analysis.

tions, and the result may be a ruling and precedent that is similarly conclusory. In such cases, the Court frequently lacks the focused argumentation that characterizes the narrow appeals arising on our discretionary docket. *See Commonwealth v. Brown,* 592 Pa. 376, 925 A.2d 147, 160, n. 8 (2007). The state of mind issue having been specifically joined by the Majority today, some further commentary is warranted.

As Mr. Justice Saylor noted in his responsive opinion in *Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110, 126–130 (2001) (Saylor, J., concurring and dissenting) Pennsylvania courts at times have seemed to blur the distinction between Pa.R.E. 803(3), the "state of mind" hearsay **exception** (statements offered for their truth) and **non-hearsay** statements offered to show the declarant's state of mind, which are not offered for the truth of the matter asserted. *See generally* PACKEL & POULIN, PENNSYLVANIA EVIDENCE, § 803(3)–1(a) (3rd ed. 2007); *see also* OHLBAUM ON THE PENNSYLVANIA RULES OF EVIDENCE, §§ 801.12, 803.3 (2007–2008 ed.). Non-hearsay state of mind statements are those that "do not directly assert a declarant's state of mind but are circumstantially probative of it, *e.g.,* demonstrating fear, knowledge, or motive." OHLBAUM ON THE PENNSYLVANIA RULES OF EVIDENCE, §§ 801.12[1]. For example, "a child's statement about how his father punishes him is admissible to explain why he feared going home," but that statement cannot be used to prove how punishment is administered. *Id.* Of course, for such statements to be admissible, the declarant's state of mind must be relevant. *See* Pa.R.E. 402.

On the other hand, direct statements by the declarant regarding his or her state of mind are hearsay (because they would be admitted for the truth of the matter asserted, *i.e.,* the speaker's state of mind) and only admissible pursuant to a hearsay exception. *See* PACKEL & POULIN, PENNSYLVANIA EVIDENCE, § 801–4. The hearsay **exception** represented by Rule 803(3) would allow statements of a "declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, or bodily health," to be offered for the truth of the matter asserted.

For example, the Commonwealth could offer a victim's hearsay statement such as, "I am going to [the defendant's] home tonight" as evidence under Rule 803(3) to prove that the victim indeed went to the defendant's home that evening. PACKEL & POULIN, PENNSYLVANIA EVIDENCE, § 803(3)–1(a)(2). This type of state of mind evidence is admissible to show that the declarant subsequently acted in accordance with his stated intent. *Id.* Again, of course, such statements are subject to the bedrock requirement of relevance.

The tendency to blur the two separate state of mind theories of admissibility no doubt arises from the thin line separating statements that are probative, but not directly assertive of a declarant's state of mind (non-hearsay) and those that are direct expressions of the declarant's present state of mind, which would fall within Rule 803(3). While the two theories may overlap, the distinction is important because it determines how, and for what purpose, the evidence may be used at trial.

The Majority broadly states that, "[e]ven those decisions adopting a broader view of the state of mind exception support the proposition that statements offered as evidence of a declarant's state of mind may not be admitted for their truth." Majority Op. at 635, 937 A.2d at 1071. This statement, and the discussion surrounding it, confuses the distinction between non-hearsay and hearsay exception uses of state of mind evidence.

Finally, I write to note the fact that the dead victim's statements are not admissible under Rule 803(3) does not mean that those statements lack relevance, and being relevant, they might be admissible under another theory. If appellant had not succeeded in killing the victim, but only in assaulting him, the victim clearly could have properly testified to everything that was relevant in his prior relationship with appellant, including evidence going to malice, ill will, motive, etc. In my view, the victim's relevant statements concerning his prior victimization at appellant's hands properly could be admitted for the truth of the matter asserted under Pa.R.E. 804(b)(6), the forfeiture by wrongdoing exception to the hearsay rule. *See id.* ("Forfeiture by wrongdoing. A statement

offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness"). This is another case "involv[ing] the [not uncommon] circumstance of a criminal defendant, on trial for murdering a human being, now complaining about the admission of the now-deceased victim's out-of-court statement upon hearsay grounds." *Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556, 563 (2002) (Castille, J., joined by Newman, J., concurring) (collecting cases). Not all criminal homicides involve perfect strangers, and so it is to be expected that, in many instances, there is a history—often recorded by the victim's statements to others—between victim and perpetrator which may shed light upon guilt, degree of guilt, intent, motive, or the background of the case.

As I recently noted in *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 471 (2006) (Castille, J., concurring and dissenting, with Eakin, J., joining the relevant point) that when a criminal defendant complains about his inability to "confront" a victim at trial that he made "unavailable" through his own criminal conduct, I would find that the victim's relevant out-of-court statements should be deemed admissible for the truth of the matter asserted under the forfeiture by wrongdoing exception. *See also Hutchinson*, 811 A.2d at 564–65; *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1067–69 (2001) (Castille, J., concurring). This Court has recognized that, in cases were the exception is implicated, "the rule appears to negate the traditional hearsay challenge to statements having the same character and context as [the victim's]." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 310 n. 10 (2002) (referring to murder victim's statement to police that she had witnessed defendant commit a prior murder, which was the argued motive for his killing her). Of course, the defendant can try to explain away the victim's account, and can argue to the jury the fact that he is impaired in his ability to challenge the statements; but I continue to believe that it is absurd to reward an accused for criminal conduct, by letting the accused totally silence his victim a second time at trial.

Here, the Majority has summarized the substantial evidence in the record, independent of any out-of-court statements by the victim, which proved that Donald Burroughs was unavailable at trial only because appellant murdered him. Based upon this independent evidence of appellant's wrongdoing in rendering Burroughs unavailable, I believe that Rule 804(b)(6) authorizes admission of the relevant statements of the victim to his friends and family concerning his relationship with appellant. As the Majority notes, we can affirm a valid judgment based upon any reason appearing of record, Majority Op. at 636–38, 937 A.2d at 1072–73 and so the ruling below can be affirmed on this alternative ground. Moreover, a discussion of alternative grounds for affirmance is particularly appropriate here, since the Court overrules *sub silentio* the authority upon which the trial court relied.

The Majority says that a footnote in the *Laich* Majority Opinion requires a conclusion that evidence of this sort can be admitted under the Forfeiture by Wrongdoing theory only where there is proof that the reason for the killing was to eliminate the victim as a witness, rather than personal animosity. To the extent the *Laich* footnote would enact such an absolutist proposition, I think it warrants revisiting. First, *Laich* failed to appreciate that this Court's Rules of Evidence are largely a codification of case precedent. The Rules are not legislation. The same practical logic and sense of proportion that led to recognition of Forfeiture by Wrongdoing in instances of witness elimination applies anytime a defendant raises a hearsay objection premised upon the unavailability of a witness he unlawfully killed. The *Laich* view presumes that the law of evidence is immutable. I would decline to treat *Laich* as a quasi-legislative rule.

Secondly, *Laich* also failed to recognize the absurdity of making the forfeiture exception depend upon the defendant's supposed intention. Only the defendant knows for certain the reason or reasons why he murdered the victim. He cannot be made to explain why he committed the murder, and even if he could, he would be unreliable. Thanks to the defendant, the victim, of course, is unavailable to shed light on the matter.

The distinction identified by *Laich* is, in my view, artificial and non-responsive to the circumstance presented in these cases. By definition, murdering a person renders him unable to testify against the killer in court. I would not make the standard of admissibility further dependent upon *Laich*-like speculation concerning a murderer's motive. I continue to vote to end the absurdity.[2]

For the foregoing reasons, with the exception of the points made above, I join the Majority Opinion.

Justice EAKIN joins this concurring opinion.

Justice BALDWIN concurring.

I join the majority opinion in full. I write separately, however, to reiterate the position that I detailed in *Commonwealth v. Carson*, 590 Pa. 501, 615, 913 A.2d 220, 287 (2006) (Baldwin, J. concurring), that an instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality) should be given in every capital case. However, as this is not the prevailing view, I am compelled to agree with the majority that the *Simmons* issue was waived.

Justice FITZGERALD joins this concurring opinion.

---

2. I also note that my joinder in footnote 9 of the Majority Opinion is subject to my understanding that in referring to the recommendations of the American Bar Association ("ABA") it goes no further than *Commonwealth v. Spencer*, 442 Pa. 328, 275 A.2d 299 (1971), *i.e.*, how the court should respond in the event of a jury deadlock. Trial courts of this Commonwealth, however, are not generally bound by ABA recommendations.