J-A16009-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DIONIA L. JAMES, | |
| Appellant | No. 350 EDA 2017 |

Appeal from the Judgment of Sentence Entered November 9, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008878-2015

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:           **FILED OCTOBER 16, 2018**

Appellant, Dionia L. James, appeals from the judgment of sentence of an aggregate term of 16-32 years' incarceration and a consecutive term of five years' probation, imposed following her conviction for third-degree murder and possessing instruments of crime (PIC).  Appellant challenges the sufficiency and weight of the evidence, and the trial court's admission of statements made by the decedent to his sister.  After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

On August 8, 2015, [Appellant] stabbed to death the decedent, Quinton Graham, at her home at 2732 Oakford Street, Philadelphia, PA.  Chantee Johnson testified that the decedent was her older brother and that he started a relationship with [Appellant] in 2011.  Ms. Johnson knew [Appellant] since 2003.  Ms. Johnson was friends with both [Appellant] and the decedent

on Facebook and testified that [Appellant] and the decedent had an on-and-off relationship but, when it was "on," it seemed fine.

Ms. Johnson had remained friends with [Appellant] when [Appellant] and the decedent were in "off" periods of their relationship. In 2015, [Appellant] and the decedent continued their "on-and-off relationship" but [Appellant] was also engaging in a relationship with [Appellant]'s daughter's father, a Mr. Jerome Brown. [Appellant] posted about her relationship with Mr. Brown on Facebook, including posts about [Appellant]'s wedding to Mr. Brown in 2015, which the decedent knew of and even "liked"[1] related photos on Facebook. However, [Appellant] continued to see the decedent after she had been married. N.T.[,] 08/22/16[,] at … 156-[]61.

> [1] The Facebook "Like" button is a feature that allows users to show their support for specific comments, pictures, wall posts, statuses, or fan pages. It allows users to show their appreciation for content without having to make a written comment.

Ms. Johnson testified further that [Appellant] told her brother "that she only got married because of the money; that her daughter's dad was dying in the hospital and she was marrying him so she could collect money after he dies." [Appellant] married Jerome Brown while he was hospitalized on August 2, 2015. Ms. Johnson last saw her brother around 9 p.m. on August 7, 2015. On that day, upon bringing [Appellant] home from helping her run errands, Ms. Johnson and her son went into [Appellant]'s house. The decedent was there at the time and had just finished doing laundry and hanging pictures for [Appellant]. The decedent was wearing a white shirt, black pants, and red and black sneakers. Ms. Johnson testified that [Appellant] and the decedent appeared happy together and in good spirits. Ms. Johnson neither saw, nor was she aware of, the decedent ever being violent towards [Appellant]. *Id.* at … 167-[]73.

At around 2:40 a.m. on August, 8, 2015, Ms. Johnson received a phone call at home from [Appellant] through Facebook Messenger.[2] [Appellant] told her that the decedent had been knocking on [Appellant]'s door and that, when she didn't answer, she heard scuffling in her back yard. [Appellant] told Ms. Johnson that she didn't get up to check because she didn't know what was going on and that she eventually heard a "boom" and somebody say "I got you, motherfu**er!" [Appellant] told Ms. Johnson that

she didn't do anything because she was scared and that when she looked out of the window and into the back yard she saw a body there in blue underwear and a "wife beater."[3] [Appellant] told Ms. Johnson that she could not tell if it was Ms. Johnson's brother or not and that she had called the police. After hearing this, Ms. Johnson and her sister, Angel Johnson, went over to [Appellant]'s house. *Id.* at … 176-[]77.

> [2] Facebook Messenger is a software application (otherwise known as an "app") that Facebook users can use to send messages to other Facebook users. Using Facebook Messenger is very similar to "texting" (*i.e.*, sending a "text message" to) someone. Phone calls may also be made through the Facebook Messenger application.

> [3] Slang for a sleeveless undershirt most often worn by men.

When Ms. Johnson and her sister arrived at [Appellant]'s house, [Appellant] met them outside at their car as they were parking and repeated the same story she had told Ms. Johnson on the phone. [Appellant] showed Ms. Johnson her phone to prove that she had already called the police. The police arrived three minutes later and [Appellant] told them the same story. [Appellant] did not seem under the influence of drugs or alcohol to Ms. Johnson. A police officer asked [Appellant] if the decedent in the back yard was the boyfriend she had been talking about and [Appellant] said "Oh my God! That's him!" After this [Appellant] went and sat on the stoop in front of her house and smoked a cigarette. Ms. Johnson identified a Facebook post made by [Appellant] of a photo with the caption: "Tomorrow is my wedding day. Sorry if you are just finding out. Not posting my life story," underneath which the decedent commented: "You look beautiful, baby girl." Ms. Johnson also identified another Facebook post by [Appellant], which showed the latter at a bar at 11:30 p.m. on August 7, 2015, hours before the decedent's murder. *Id.* at … 179-201.

Angel Johnson, sister to the decedent and Chantee Johnson, testified that she has known [Appellant] for more than a decade. According to Angel Johnson, the decedent and [Appellant] were dating, on-and-off, for about six or seven years. Angel Johnson knew that [Appellant] and the decedent were still seeing each other when [Appellant] married Jerome Brown. The decedent was not upset about [Appellant]'s marriage to Mr. Brown. N.T.[,]08/23/16[,] at … 24-28.

- 3 -

Dorothea Graham, who goes by Renee, testified that she is also a sister of the decedent and she has known [Appellant] for about twelve (12) years. Graham lived down the street from [Appellant]. [Appellant]'s daughter [is] the cousin of Graham's children, so when Graham would take her kids to the pool, she would stop by [Appellant]'s house to pick up [Appellant]'s daughter as well. Graham testified that [Appellant] never mentioned or complained of being abused by the decedent and [Appellant] never had any related injuries that Graham noticed. Graham talked to her brother almost every day and testified that he was not upset by [Appellant]'s marriage to Jerome Brown, whom Graham knew to be hospitalized at the time of the nuptials. *Id.* at … 62-71.

Jerome Brown, the husband of [Appellant], testified that he married [Appellant] on August 2, 2015 and that he is the father of their eight-year-old daughter. Their relationship was off-and-on for about eight years. While he was hospitalized in July of 2015, Mr. Brown and [Appellant] decided to get married. 2732 Oakford Street was rented in Mr. Brown's name. [Appellant] moved into the house as soon as Mr. Brown was admitted into the hospital in April of 2015 with complications of Crohn's disease. He remained hospitalized for about seven (7) months. Mr. Brown testified that no one else was supposed to be living at the house besides [Appellant] and their daughter. Both Mr. Brown and his daughter receive their own Social Security checks. Mr. Brown was not aware that [Appellant] had any type of relationship with the decedent, had never met the decedent, and assumed [Appellant] was faithful to him while he was hospitalized. N.T.[,] 08/24/16[,] at … 115-[]31.

Kevin Brown, brother-in-law to [Appellant] and brother to Jerome Brown, testified that, while his brother was in the hospital, he regularly drove [Appellant] to and from the hospital to visit Jerome Brown and drove [Appellant]'s daughter to and from school. Kevin Brown testified that he would be upset if he knew that [Appellant] was seeing someone other than Jerome Brown, her husband. *Id.* at … 135-[]44.

[Appellant] … testified that she met the decedent, Quinton Graham, in 2010 and that they had an on-and-off relationship that carried into 2015. [Appellant] moved into 2732 Oakford Street in April of 2015 and married Jerome Brown on August 2, 2015. *Id.* at … 151-[]62. [Appellant] heard a loud banging on her front door in the early morning hours of August 8, 2015. When she answered

the door, the decedent, who was drunk, pushed himself inside of the house. She ran upstairs to the bathroom and when she came back downstairs to the kitchen, the decedent was standing there with a nosebleed, which she attempted to help him with by telling him to put his head back. The decedent tried to clean up the blood on the floor from his nosebleed with the mop. When [Appellant] told the decedent to leave, he started physically fighting with her and pulled a knife, which [Appellant] grabbed from him then "poked him" with it. The knife remained in the decedent's chest after the "poke" and he grasped it, walked out of the back door, and into the rear yard. [Appellant] waited "a while" before going outside to check on the decedent, where she found him rolling around on the ground "like a fish." [Appellant] saw blood on the decedent's face, which caused her to call the police at 2:36 a.m. [Appellant] also called the decedent's sister, Chantee Johnson. When Chantee and Angel Johnson arrived, before the police, [Appellant] told them "your brother is out there!" and pointed to the back yard. *Id.* at … 177-[]80.

Philadelphia Police Officer David Harrison testified that, on August 8, 2015, he received a radio call from a police dispatcher assigning him to investigate a report of a person laying in the rear yard of 2732 Oakford Street. Upon arrival around 3 a.m., Officer Harrison was led by a young woman into the house and through to the kitchen, where, in front of the back door, there were trash cans and a barricade (a 2"x5" piece of wood resting on hooks on either side of the door). The woman moved the items out of the way and opened the back door, which is when Officer Harrison saw a male, the decedent, lying face down towards the rear of the yard. At trial, Officer Harrison identified [Appellant] as the woman who had led him into the house. N.T.[,] 08/22/16[,] at … 70-72, 81, 83.

Officer Harrison further testified that [Appellant] told him that the decedent was her boyfriend. There were two other females in the house who identified themselves as sisters of the decedent. When Officer Harrison shined his flashlight into the back yard and onto the decedent, the two women said "that's my brother." Philadelphia Police Officer Ellis went through the neighbor's back yard to gain entry to the back yard of 2732 Oakford Street and approach[ed] the decedent. Officer Ellis confirmed that the male appeared to be deceased. The decedent was in his underwear, wearing a black tank top, had leaves scattered across his body, and a child's basketball net/pole was laying across his legs. [Appellant] told Officer Harrison that she

- 5 -

had last seen the decedent around midnight. About an hour after that, she heard a knock at the door which she didn't respond to because she was laying down. After some time went by, she heard a loud banging outside and looked out to see a male in her back yard. At that point she called her boyfriend's sisters to the house and told them there was a male in her back yard. Officer Harrison noted that there was an odor of cleaning product about the house. He also noticed blood on a mop handle, sponge, and a bloodstain on a carpet, which he recorded in the crime-scene log. While he was there, [Appellant] and the decedent's two sisters were transported to the homicide unit. [Appellant] did not appear to have any injuries. *Id.* at … 73-77, 83-88.

Philadelphia Police Sergeant James Ross of the Narcotics Enforcement Team testified that on August 8, 2015[,] he received a vague radio call about someone being in the backyard of 2732 Oakford Street. Officer Harrison and Officer Ellis were present when he arrived. Sergeant Ross and Officer Ellis went around to the back of the property where Officer Ellis shined his flashlight over the fence, revealing a body laying at the end of the yard. Officer Ellis climbed over the fence. [Appellant] told Sergeant Ross that she believed the body in the back yard was that of her boyfriend, the decedent. Officer Ellis checked the body for a pulse to no avail and when the medics arrived they pronounced the decedent at 3:25 a.m. The decedent was laying face down on his stomach with his arms outstretched above his head. He was wearing socks, underwear, and a t-shirt and had leaves covering his body. No shoes or pants were found in the back yard. *Id.* at … 103-[]12.

[Appellant] told Sergeant Ross that the last time she saw the decedent was around midnight when he had left the house with his brother, Malcolm, after she gave the decedent $20 to go and get some cocaine. She told Sergeant Ross that the decedent and his brother had been in the house all day. [Appellant] further stated that sometime after the decedent left, she heard a knock on the front door, then she heard a loud bang in the rear of the property followed by a voice saying[,] "I got you, mother fu**er!" She told Sergeant Ross that she tried calling the decedent on the phone but noticed that, when she did, she heard his phone ringing in the house (she showed Sergeant Ross the decedent's cell phone laying on the futon). She also told Sergeant Ross that the decedent was wearing torn jeans, a t-shirt, and Air Jordan basketball sneakers when he left the house, but no torn jeans or Air Jordan sneakers were found on the premises. Sergeant Ross

noticed a bloody fingerprint on the interior doorknob of the rear door to the property, as well as what appeared to be blood on the washing machine and on a mop. He noted that [Appellant] never mentioned any injuries to herself and that the house smelled as though it had just been cleaned. Sergeant Ross testified that his observations of the decedent's arms stretched above his head and the shirt rolled up around his torso led him to believe that the decedent had been dragged to this position a[t] the rear of the yard. *Id.* at … 114-[]20, 131.

Philadelphia Police Sergeant Peter Singer testified that he was one of the last officers to arrive at 2732 Oakford Street. Upon arrival, he noticed that the house smelled like cleaning fluid and that there was blood on the handle of a mop. *Id.* at … 140-[]41. When Sergeant Singer first went through the house, [Appellant] had a cell phone sitting next to her on a bed on the first floor. After Sergeant Singer had officers take [Appellant] to the Homicide Unit, he noticed that the phone was no longer on the bed, so he called for the officers to bring [Appellant] back to the house to return the phone, which she did. Sergeant Singer saw no torn jeans or knife on the scene and noted that [Appellant] did not appear to have any injuries, nor did she claim to. Sergeant Singer did notice a pair of men's, white and red Air Jordan sneakers in the laundry area in the back of the house. The house looked freshly cleaned and organized, "like it might if you were planning to have company over." *Id.* at … 142-[]48.

Philadelphia Police Officer Brian Stark of the Crime Scene Unit testified that he arrived on the scene at 2732 Oakford Street at 6:50 a.m. on August 8, 2015. He described the photographs he took at the scene for the jury. N.T.[,] 8/23/16[,] at … 102-[]03. Samples were collected from five (5) bloodstains: one on the living room carpet, two on the kitchen's hardwood floor, one on a mop's handle in the kitchen, [and] one on a washing machine in a laundry area next to the kitchen. Officer Stark testified that there were smears and droplets of blood throughout the kitchen floor. *Id.* at … 108-[]22. Officer Stark testified that the distance from the back door to where the decedent was found was twelve (12) to thirteen (13) feet. The distance from the blood stain on the carpet in the living room to the backdoor area was about eighteen (18) feet. On the right foot of the decedent there were bloodstains on his sock that were indicative of droplets (*i.e.*[,] it appeared that they were formed from blood that dropped from above onto the sock and did not form from the skin beneath the sock). When the decedent was turned over from his stomach onto

his back, an accumulation of dirt was noticeable on the tips of the fingers and wrist of his left hand. His left hand also had cuts on the middle finger. *Id.* at … 134-[]41.

Homicide Detective Howard Peterman testified that, on August 8, 2015, he was assigned to investigate the homicide of the decedent. Detective Peterman interviewed and took statements from Angel Johnson and [Appellant] the same day. Detective Peterman first spoke with [Appellant] around 5:15 a.m. at the Homicide Division. [Appellant] was not emotional but appeared eager to tell him what happened. Initially, [Appellant] told Detective Peterman that someone knocked on her door that she believed was the decedent but she didn't answer the door. She told Detective Peterman that she then heard noises in her back yard, then a loud boom, followed by someone yelling[,] "I got you!" She told Detective Peterman that she could not see anything in the yard and that she then called both the police and two of the decedent's sisters. *Id.* at … 180-[]92.

After this initial, informal conversation, Detective Peterman told [Appellant] that he was going to take a formal, typed statement from her and informed her that he had talked to Angel and Chantee Johnson. At this point, [Appellant]'s story changed. [Appellant] told Detective Peterman that she and the decedent were having an argument, that the decedent had a knife, tripped on a rug, fell on the knife, and then jumped up, ran out the back door, and collapsed in the back yard. Detective Peterman then moved [Appellant] into an interview room equipped with audio and video recording and came back with Detective Morton to continue the interview. [Appellant] told Detectives Peterman and Morton that the decedent stabbed himself in the chest after stating that he and [Appellant] were both going to die that night. [Appellant] continued that the decedent ran outside with the knife in his chest and collapsed where he was found. [Appellant] offered up that she did not drag the decedent into the back yard after he stabbed himself. [Appellant] also told the Detectives that she had lied previously when she said that the decedent had fallen on his knife and when she said that there was a male in her back yard yelling[,] "I got you, motherfu**er!" [Appellant] reviewed, signed, and dated this statement she gave to Detectives Peterman and Morton. *Id.* at … 192-202.

Detective Peterman testified that, at the time of her formal interview, [Appellant] told him that she had injuries and pointed to marks that did not look recent or serious. Photographs were

then taken with [Appellant] pointing to where she had been injured: the inside of her elbow, the back of her foot (where she stated that she had been kicked), and her left breast. *Id.* at … 202-[]06. [Appellant] had an HTC cell phone on her which she turned over to Detective Peterman, who had to submit the phone to experts for unlocking when the pass-code provided by [Appellant] did not work. N.T.[,] 08/24/16[,] at … 5-7.

Detective James Burns of the Philadelphia Police Department's Homicide Unit testified that he was called to investigate the crime scene at 2732 Oakford Street on August 8, 2015. Detective Burns searched every room in [Appellant]'s house (including the basement) looking for a knife and a pair of dark pants [as well as in] the trash can outside, the empty lot and alleyway adjacent to [Appellant]'s house, and [Appellant]'s back yard and did not find either item. He searched under the mattresses, in drawers, and in the toilet tank as well. *Id.* at … 84-88.

Dr. Daniel Brown, Associate Medical Examiner of the City of Philadelphia, testified as an expert in the field of forensic pathology. *Id.* at … 30. Dr. Brown testified, to a reasonable degree of medical certainty, that the decedent's cause of death was a single stab wound to the chest and the manner of death was homicide. The stab wound penetrated the decedent on the left side of his chest and went through his pectoral muscle, sternum, the pericardial sac that surrounds the heart, into the front side of his heart, out of the backside of his heart, and was stopped when the tip of the instrument used hit his spine. The injury was not immediately fatal and over two (2) liters of blood, which had been pumped out of the wound in the decedent's heart, was recovered from his chest cavity. Dr. Brown testified that this amount of blood was about half the amount contained in an average human body. *Id.* at … 39-47. The entrance wound on the decedent's chest was consistent with the type of wound a single-edged knife would make. If the knife had been pulled out while the decedent was still standing, it is possible that blood would have dripped down from the wound. The pool of blood that was found under the decedent was also consistent with the type of wound he had on his chest. Abrasions on the decedent's side and inside of his elbow were consistent with abrasions that would occur if the decedent had been dragged through debris face down with his arms above his head. The cut on the decedent's hand was also consistent with a defensive wound. *Id.* at … 71-78.

- 9 -

> [Appellant's] [t]rial counsel stipulated to the fact that, to a reasonable degree of scientific certainty, the DNA in the blood found on the living room carpet, the mop's handle, and the front of the washing machine at 2732 Oakford Street belonged to the decedent, Quinton Graham. [Appellant's] [t]rial counsel additionally stipulated to the fact that the DNA found in a stain on the mop's sponge was, to a reasonable degree of scientific certainty, a mixture of DNA from [Appellant] and the decedent. It was indeterminable whether this DNA came from blood, spit, epithelial cells,[4] or any other biological material that contains DNA. *Id.* at … 98-108.
>
> > [4] Epithelial cells are "any of the cell forming the cellular sheets that cover surfaces, both inside and outside the body."

Trial Court Opinion (TCO), 8/18/17, at 4-14 (some citations omitted).

Following an investigation, the Commonwealth charged Appellant generally with murder, 18 Pa.C.S. § 2502, and PIC, 18 Pa.C.S. § 907(a). A jury trial occurred on August 22-26, 2016, at the conclusion of which the jury found Appellant guilty of third-degree murder and PIC. On November 9, 2016, the trial court sentenced Appellant to an aggregate term of 16-32 years' incarceration, followed by 5 years' probation.[1] Appellant filed a timely post-sentence motion challenging the weight of the evidence on November 16, 2016, which the court denied on January 18, 2017. Appellant then filed a timely notice of appeal on January 24, 2017. She also filed a Pa.R.A.P. 1925(b) statement on February 8, 2017. The trial court issued its Rule 1925(a) opinion on August 18, 2017.

Appellant now presents the following questions for our review:

---

[1] The trial court sentenced Appellant to 16-32 years' incarceration for third-degree murder, and to a consecutive term of 5 years' probation for PIC.

1. Were the verdicts of murder of the third degree and possession of an instrument of crime not supported by sufficient evidence and was the evidence inconsistent and speculative, and as a result, also violated fundamental due process? …

2. Were the verdicts of murder of the third degree and possession of an instrument of crime against the weight of the evidence based on inconsistent and speculative evidence and violated fundamental due process? …

3. Did [the trial court] err in allowing hearsay statements made by the decedent about the reason [Appellant] married Mr. Brown? Was the hearsay statement of the decedent highly prejudicial since it suggested [Appellant] only married her husband for his money and since he was gravely ill, she would then collect her husband's monies?  Did this inadmissible hearsay taint the jury against [Appellant]?  Further, did this hearsay statement deny [Appellant's] right to confront the witnesses under the Sixth Amendment of the United States Constitution through the Fourteenth Amendment, and pursuant to Article I, Section 9 of the Pennsylvania Constitution?

Appellant's Brief at 5-6.

Appellant's first claim concerns the sufficiency of the evidence.  Our standard of review of sufficiency claims is well settled:

A claim challenging the sufficiency of the evidence is a question of law.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.  Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law.  When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

- 11 -

Third-degree murder is a killing done with legal malice but without the specific intent to kill required in first-degree murder. Malice consists of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty. Malice exists where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury. Malice may also exist where the omission or failure to perform a legal duty was willful and will probably result in the death of the victim.

***Commonwealth v. Kellam***, 719 A.2d 792, 797 (Pa. Super. 1998) (citations, quotation marks, and brackets omitted).

Appellant asserts that it

is pure and naked speculation and conjecture that [Appellant] did not act in self-defense since it was in her household, [the decedent] was not supposed to be there, [decedent] was highly intoxicated and [decedent] had the motive for assaulting [Appellant] since she had married someone else the week before.

Appellant's Brief at 55.

Thus, by alleging that she acted in self-defense, Appellant concedes her identity as the person who stabbed the decedent, causing his death. However, Appellant asserts that the Commonwealth failed to meet its burden to disprove that she acted in self-defense.

[A] claim of self-defense (or justification, to use the term employed in the Crimes Code) requires evidence establishing three elements: (a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat. Although the defendant has no burden to prove self-defense, … before the defense is properly in issue, there must be some evidence, from whatever source, to justify such a finding. Once the question is properly raised, the burden is upon the Commonwealth to prove

- 12 -

beyond a reasonable doubt that the defendant was not acting in self-defense. The Commonwealth sustains that burden of negation if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that he was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save himself therefrom; or that the slayer violated a duty to retreat or avoid the danger.

*Commonwealth v. Mouzon*, 53 A.3d 738, 740–41 (Pa. 2012) (citations, quotation marks, brackets, and footnote omitted).

Here, the trial court found that the Commonwealth presented the jury with ample evidence demonstrating that Appellant's claim of self-defense was not credible. The decedent was killed by a single stab wound that penetrated all the way through his pectoral muscle, sternum, and heart, until the blade finally stopped when it collided with his spine. This was despite Appellant's contention (among numerous versions of events that she conveyed to police) that she had merely poked the decedent with the knife. The decedent also had a cut on his hand that appeared to be a defensive wound. By contrast, Appellant had no significant wounds that would corroborate her claim that she had been defending herself prior to her stabbing the decedent.

Appellant also claimed that the decedent "went into the yard after being stabbed and fell down." TCO at 24. However, the evidence at the crime scene contradicted this account, and instead demonstrated that he was dragged from inside of the house to the backyard. Wounds on the decedent's body were consistent with his being dragged in that fashion, and blood was found "on the living-room carpet, the sponge and handle of the mop, and smeared

across the front of the washing machine." *Id.* "If the blood was just from a nosebleed, as [Appellant] testified, it seems improbable it would be so much and spread so far." *Id.*

Moreover, "[d]isposing of the knife and the decedent's pants and sneakers, cleaning blood from the floor and washing machine, dragging the decedent's body to the end of the back yard, and partially covering it with debris are all strong indications of a guilty state of mind, [which] the jury was free to find (or not)." *Id.*, *see also Commonwealth v. Robson*, 337 A.2d 573, 579 (Pa. 1975) (recognizing that "actions subsequent to the killing in attempting to destroy or dispose of evidence [can be] interpreted by the jury as evidencing consciousness of guilt").

Appellant also asserts that it was mere speculation for the jury to conclude that the decedent was not the aggressor and, thus, that she had no duty to retreat under the castle doctrine. Appellant's Brief at 58-59. The castle doctrine is codified in Section 505(b)(2):

> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> > (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
> >
> > (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, *except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.*

- 14 -

18 Pa.C.S. § 505(b)(2) (emphasis added).

Appellant's castle doctrine argument hinges on the credibility of her testimony that she was not the initial aggressor. However, Appellant's version of events continued to evolve with each telling, and it was only the last two accounts which supported a claim of self-defense at all, much less one based on the castle doctrine. Appellant also told police on the night of the incident that the decedent had fallen on the knife, stabbing himself, and, alternatively, that some unknown assailant had attacked him in the backyard. It is not surprising, therefore, much less mere speculation, that the jury did not find Appellant's account of events leading to the death of the decedent to be credible.

In sum, we concur with the trial court that this combination of circumstances and evidence was sufficient for the jury to find, beyond a reasonable doubt, that Appellant acted with malice when she killed the decedent, and that she did not act in self-defense. There was no evidence demonstrating that Appellant reasonably believed that she "was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim," beyond her own testimony, which the jury was free to disbelieve. *Mouzon, supra*. Moreover, Appellant's repeated attempts to cover up her actions by staging the scene of the crime and repeatedly lying to police, coupled with her use of a deadly weapon on a vital

part of the decedent's body,[2] provided more than sufficient evidence to establish that she acted with malice. Consequently, the evidence was sufficient to support a guilty verdict for third-degree murder in this case. For the same reasons, we also conclude that the evidence was sufficient to support Appellant's PIC conviction, as Appellant used the knife with the "intent to employ it criminally." 18 Pa.C.S. § 907(a).

Appellant next challenges the weight of the evidence supporting her conviction. We apply the following standard of review to a challenge that a verdict is against the weight of the evidence:

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> > Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
> >
> > This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In

---

[2] "[T]he use of a deadly weapon upon a vital part of the body alone is sufficient to establish malice." **Commonwealth v. Torres**, 578 A.2d 1323, 1325 (Pa. Super. 1990).

describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).

We incorporate our analysis of Appellant's sufficiency claim herein. The crux of this case was whether Appellant's self-defense claim was credible. Clearly, the jury decided that it was not, and ample evidence supported the rejection of that claim. Thus, we ascertain no abuse of discretion in the trial court's determination that the jury's verdict was not against the weight of the evidence.

Finally, Appellant challenges the admission of a statement made by the decedent, offered through the testimony of his sister, that Appellant only married her husband, Mr. Brown, for his money. We review a challenge to the admission of evidence under the following standard:

> The admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is

manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will discretion ... is abused."

***Commonwealth v. Murray***, 83 A.3d 137, 155-56 (Pa. 2013) (internal citations omitted).

This issue arose on multiple occasions, as Appellant describes in her argument as follows:

> The District Attorney [(hereinafter "DA")], in her opening statement, made the following improper hearsay comments:
>
> > [DA]: Again, Quentin's sisters, why would you stay with her? Why would you stay with her? She married him. What are you doing? You will hear testimony from the sisters that he stayed because she convinced him that it was only for the money. It was only for the money. He was going to die and she was going to get the money.
> >
> > [Defense Counsel, hereinafter "DC"]: Objection. Move for a mistrial.
> >
> > The [c]ourt: Are you going to present evidence of that?
> >
> > [DA]: Yes, Your Honor.
> >
> > The [c]ourt: If she does, then it is in. If she doesn't, ignore it.
>
> [N.T., 8/22/16, at 36-37.]
>
> During the testimony of the sister of the decedent, Chantee Johnson, the [DA], following up on her opening statement, asked the following question:
>
> > Question: At the time, did you question your brother about being with her?
> >
> > Answer: I did.
> >
> > Question: What did you say to your brother?
> >
> > Answer: I asked him like, you are still dealing with her. She just got married. Why are you still dealing with her? She just got married. And then he said...

- 18 -

[DC]: Objection.

The [c]ourt: Sustain to that.

[*Id.* at 161.]

There was then a side bar conference where [DC] strongly objected. [DC] noted he objected previously in the opening statement [*Id.* at 162]. The [DA] said this statement was being offered for the decedent's state of mind.

[DA]: It is being offered for his state of mind, that that's what she told him, regardless of whether or not she married him because she loved him because she wanted to be with him. That is not being offered for….

The [c]ourt: How is his sister going to say that the victim was okay with it?

[DA]: The victim told him that he was fine with it because the decedent said she loved him, it was just for money.

[*Id.* at 163, 164].

[DC] then stated this was rank hearsay of what the decedent supposedly told the sister. [DC] noted this was totally inadmissible and was rank hearsay because it showed a motive for them to live together. [*Id.* at 164, 165].

One can see how unfair this hearsay was. [Appellant] was contending the decedent did not live with her and came into the house when he should not have been in the early morning hours. The Commonwealth was trying to show through the sisters that the decedent was living with [Appellant] at the time. They were trying to show that by words apparently from the grave of what the decedent supposedly told the sisters, and that issue was hotly contested.

The judge then said the following about this argument:

The [c]ourt: Let the jury decide. You don't want her to use it, but then you will use it and...

[DC]: I am not going to use anything about she married him for the money. That is just false. It's not true.

The [c]ourt: No. You're going to say he was jealous because she got married and then fair rebuttal to that is he wasn't

- 19 -

jealous because she told him she only got married for the money but she still loved him.

[DC]: Except that she already got that in without married for the money but four questions before, she asked what did your brother say? Did your brother know about the marriage?

[*Id.* at 165-[]67].

[The trial court] then overruled and allowed the testimony. The sister then, before the jury, testified as follows:

Question: My last question concerning your brother, did you question him about why he stayed with her even though she was married?

Answer: Yes.

Question: What did he tell you?

Answer: He said because she told him that she only got married because of the money, that her daughter's dad was dying in the hospital and she was marrying him so she could collect money after he dies.

[DC]: Just note my continuing objection and mistrial motion.

The [c]ourt: Overruled.

[*Id.* at 167].

This was very damning and tainting evidence before a jury. This hearsay testimony, which could not be confronted from the decedent was essentially saying that [Appellant] was a horrible person, married a dying man for his money, and was still living with the decedent because she loved him.

[Appellant] … totally denied ever making that statement. In fact, the evidence was unrefuted she was visiting her husband for hours every day in the hospital. The testimony of [Appellant] and the brother-in-law was that [the decedent] did not live in the house. There was no physical evidence that he lived there at all (no clothing, etc.). But the [c]ourt then allowed the sister to say the decedent told her he did live with her because [Appellant] said she only married Mr. Brown, her husband, for the money, and thought he was going to die.

- 20 -

This clearly would taint the jury about making [Appellant] a bad person, but also would give credence to the issue that [the decedent] lived in the house. That was a disputed issue. But there was no evidence of that except now this hearsay testimony of [the decedent] and this hearsay testimony of him that could not be confronted that [Appellant] had a motive for marrying Mr. Brown and that [the decedent] could still live there because she still loved him.

Appellant's Brief at 66-70 (Appellant's quotation marks omitted).

The evidence at issue involves two layers of hearsay: first, Appellant's underlying statement to the decedent that she only married Mr. Brown for his money and, second, the decedent's statement to his sister conveying that underlying statement. The underlying statement is not "excluded by the rule against hearsay[,]" because it is an opposing party's statement. *See* Pa.R.E. 803(25).

At issue, therefore, is the decedent's statement to his sister that Appellant told him that she only married Mr. Brown for his money. The trial court determined that the

statement in question is not hearsay. This statement was not offered for the truth of the matter asserted-that [Appellant] actually married her husband because she stood to inherit money upon his impending death. Rather, it was to show that the decedent believed that [Appellant] only married for monetary gain and[,] therefore[,] was not experiencing jealousy such that he would attack [Appellant] in a fit of jealous rage. The decedent's state of mind was relevant to [Appellant's] claim that she had to defend herself against the decedent, who was the first aggressor because he was jealous and angry at [Appellant] for marrying Jerome Brown.

TCO at 29.

We agree with the conclusion of the trial court. The statement at issue was either non-hearsay, or, alternatively, hearsay permitted under the state of mind exception to the hearsay rule. Hearsay is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). A statement not offered for its truth is not hearsay at all and, therefore, is not excludable under the prohibition against hearsay. Here, the trial court determined that the statement at issue was not being offered to prove that Appellant married solely for money but, instead, to demonstrate that the decedent believed it to be true and, therefore, that he did not have a jealous motive to attack Appellant as she claimed. The decedent's motive (or lack thereof), was not dependent on the veracity of the statement, but on his belief in its veracity. This evidence became relevant because Appellant asserted a self-defense claim and, in so doing, claimed that the decedent attacked her in a fit of jealous rage due to her marriage to Mr. Brown. We ascertain no abuse of discretion in the trial court's determination that this was non-hearsay.

Alternatively, this statement would be admissible under the state of mind hearsay exception, even if admitted for the truth of the matter asserted. Rule 303 provides an exception to the hearsay rule for:

> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact

- 22 -

> remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).   This is otherwise known as the "state of mind" exception to the hearsay rule.

Here, the relevant fact at issue concerned the decedent's motive to attack Appellant, which Appellant brought into contention by raising a self-defense claim in which she alleged that the decedent attacked her out of jealousy.  The decedent's statement to his sister conveyed that he was not jealous, or that he was less likely to be jealous, as a result of Appellant's marriage to Mr. Brown.  Thus, even if the at-issue statement was hearsay, it would be admissible under the state of mind hearsay exception.  Notably, the decedent's state of mind was only relevant because of Appellant's self-defense claim, whereby she asserted that the decedent had attacked her, in part, because he was jealous that she had married Mr. Brown.[3]

---

[3] Appellant asserts that decedent's motive was not yet at issue during the Commonwealth's case-in-chief, because Appellant had not yet testified that he had attacked her out of jealousy.  However, in statements she made to police, she had stated both that the decedent was her boyfriend, and that they had an argument that led to violence.  Moreover, during the opening argument for the defense, Appellant's attorney asserted that the confrontation between Appellant and the decedent was caused, in part, by "a relationship that he just didn't want to see end[.]"  N.T., 8/22/16, at 66.  From this evidence, including the fact that the killing occurred in Appellant's husband's home, as well as due to Appellant's assertion of self-defense (which the Commonwealth was required to disprove during its case-in-chief), we conclude that the decedent's motive to attack her (or lack thereof) was properly at-issue even before Appellant's specific testimony regarding the decedent's alleged jealous motive.  Nevertheless, Appellant did, in fact, testify regarding the decedent's motive during her in-court testimony, indicating that he was upset that she married someone else.  N.T., 8/25/16, at 40.

Appellant asserts that the trial court's reliance on **Commonwealth v. Moore**, 937 A.2d 1062, 1070 (Pa. 2007), was misplaced. Appellant's Brief at 75-76. However, our review of the trial court's opinion reveals that the court was not relying on **Moore** to make a factual comparison to the instant case, but instead to simply quote a boilerplate legal concept. **See** TCO at 29 (quoting **Moore** for the proposition that, "[a] victim's state of mind evidence is relevant where an issue of self-defense, suicide, or accidental death is raised by the defendant").

Nevertheless, Appellant also asserts that **Moore** is instructive here, as the **Moore** Court determined that evidence of the victim's state of mind was inadmissible (although it ultimately concluded that error was harmless). However, **Moore** is clearly distinguishable, as the victim's state of mind was irrelevant in that case, where Moore did not assert self-defense, or that the victim in that case died of suicide or accidental death, and the "testimony concerning [the a]ppellant's intimidation and bullying of the victim over the course of a number of years was plainly relevant to his motive only to the degree that the hearsay statements were true. Moreover, the Commonwealth specifically and substantially relied upon their truth at trial…." **Moore**, 937 A.2d at 1072. Here, the hearsay statements at issue were limited to demonstrate the decedent's state of mind in relation to Appellant's self-defense claim. Moreover, Appellant has not shown by reference to the record any substantial reliance on the truth of those statements to establish *Appellant's* motive or *mens rea*. While there may have been some risk that

the jury could have viewed Appellant's selfish motive for marrying Mr. Brown as evidence of her malice in killing the decedent, that risk was tenuous, and we see no evidence in the record of the Commonwealth's seeking to exploit that evidence to prove Appellant's malice directly.

Appellant asserts that the admission of the decedent's statements through his sister's testimony violated her rights under the Confrontation Clause. However, Appellant does not indicate where in the record she objected to the at-issue statements on that basis. When Appellant first objected during the prosecutor's opening statement, there was no mention of the Confrontation Clause. *See* N.T., 8/22/16, at 36-37. During a long sidebar discussing this matter during Chantee Johnson's testimony, the defense made no mention of the Confrontation Clause. *See* N.T., 8/22/16, at 162-[]67. The first appearance of Appellant's Confrontation Clause argument appears in her Rule 1925(b) statement. *See* Rule 1925(b) Statement, 2/8/17, at 3. As such, Appellant waived this issue. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Judgment of sentence *affirmed*.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/18

- 25 -